UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WPIX, INC., WNET.ORG, AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS INC., THE CW TELEVISION STATIONS INC., NBC UNIVERSAL, INC., NBC STUDIOS, INC., UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC, NBC TELEMUNDO LICENSE COMPANY, OFFICE OF THE COMMISSIONER OF BASEBALL, MLB ADVANCED MEDIA, L.P., COX MEDIA GROUP, INC., FISHER BROADCASTING-SEATTLE TV, L.L.C., TWENTIETH CENTURY FOX FILM CORPORATION, FOX TELEVISION STATIONS, INC., TRIBUNE TELEVISION HOLDINGS, INC., TRIBUNE TELEVISION NORTHWEST, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, TELEFUTURA NETWORK, WGBH EDUCATIONAL FOUNDATION, THIRTEEN, and PUBLIC BROADCASTING SERVICE, | Docket No. 10 Civ. 7415 (NRB) |

Plaintiff,

v.

IVI, INC. and TODD WEAVER,

Defendants.

## MEMORANDUM IN OPPOSITION TO MOTION FOR

## TEMPORARY RESTRAINING ORDER

## AND/OR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION _____ 1

BACKGROUND FACTS AND SUMMARY OF ARGUMENT _____ 2

ARGUMENT _____ 5

    I.   ivi's Secondary Transmissions are Licensed under Section 111 _____ 6

       A.   ivi is entitled to a statutory license under Section 111 _____ 6

       B.   Internet television is "permissible" by the FCC_____ 16

    II.   The Media Companies will not suffer irreparable harm _____ 19

    III.   The balance of the hardships favors ivi _____ 24

    IV.   An injunction would not be in the public interest _____ 24

    V.   Conclusion _____ 25

Certificate of Service_____ 26

**INTRODUCTION**

In this action, the television stations and large media companies have yet again pounced upon a smaller competitor who dares to take advantage of the statutory licensing provisions of the Copyright Act. Congress and the Supreme Court have long recognized the important public interest in providing access to television content as broadly as possible.  Prior to the Copyright Revision Act of 1976, the Supreme Court had determined that retransmission of television signals by cable companies did not infringe copyrights because such retransmissions were not "performances" under the 1909 Copyright Act. *Teleprompter Corp. v. Columbia Broadcasting System, Inc., 415 U.S.  394 (1974)*; *Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968)*. In the 1976 Copyright Act, Congress concluded that cable operators should be allowed to continue to retransmit over-the-air broadcasts originating with other television stations, but that they should pay royalties to the owners of the copyrighted programs contained in those broadcasts. They recognized, however, that "it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner" in order to secure consent for such retransmissions. Copyright Law Revision, H. R. Rep. No. 94-1476, p. 89 (1976). Section 111 of the 1976 Copyright Act codifies the solution devised by Congress to allow retransmission without securing permission from the copyright owners while providing a mechanism for paying fees to those copyright owners.

Through statutory licensing, Congress sought to advance the important public purpose framed in the Copyright Clause of the Constitution, *Art. I, § 8, cl. 8*, of rewarding the creators of copyrighted works and of "promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975)*. The system therefore protects the commercial value of the copyrighted works by requiring payment to authors while at the same time advancing the Constitutional purpose of "promoting broad public availability" through the wider dissemination of the works carried by television broadcast signals.

1

The Plaintiffs in this action (collectively referred to as the "Media Companies") assert that ivi, Inc. (ivi uses a lower case "i" in its name) is "stealing" their content and "fencing" it to others. Of course, Section 111 of the Copyright Act does not call it "stealing" and "fencing," but rather receiving "primary transmissions" and retransmitting them as "secondary transmissions" to customers who pay for them. From its inception many of the Media Companies have expressed dissatisfaction with the statutory license because it literally allows companies like ivi to receive the copyrighted content and resell it to others in exchange for a governmentally-established fee. To the extent the Media Companies are dissatisfied with the law, however, they should direct their complaints to Congress rather than disparaging ivi, using sharp language, and twisting the facts out of proportion.

Though the pending motion ultimately should be denied, this Court should refrain from any evaluation of the merits of the present action, including the pending motion for a preliminary injunction or temporary restraining order, until after the Western District of Washington has first decided whether to retain jurisdiction over ivi's declaratory judgment action previously filed in that court. Accordingly, ivi is contemporaneously filing a motion to transfer this action to the Western District of Washington where it can be consolidated with ivi's earlier filed action. In the event this Court eventually does retain jurisdiction, the present motion should be denied because the plaintiffs cannot prevail on the merits, there is no irreparable harm, the balance of the hardships weighs greatly in ivi's favor, and the public interest is not served by an injunction.

**BACKGROUND FACTS AND SUMMARY OF ARGUMENT**

ivi is an entity that receives over-the-air broadcasts of television content that originates with others, including the Media Companies. ivi then simultaneously makes a secondary transmission containing the original content from the primary transmissions of the Media Companies. Consumers who have downloaded the ivi TV player to an Internet-enabled device can receive television content over the Internet in the same way that traditional cable or satellite television consumers are able to play the identical content using a set top box or similar player.

In accordance with the statutory licensing provisions of the Copyright Act, ivi is expressly authorized to make such transmissions by making applicable payments to the Copyright Office. There is no theft or piracy, but rather a mandatory license under which ivi is statutorily allowed to make secondary transmissions of content originating with the Media Companies.

As the Media Companies concede, they do not presently know the details of ivi's technical operations. They assert, inaccurately, that ivi's secondary transmissions are streamed to paying customers around the world using a peer-to-peer system. Though ivi's system is capable of operating in this manner, at present it does not use a peer-to-peer configuration and does not transmit content received from over-the-air broadcasts outside the U.S. Weaver Dec. at ¶4.

Though it is correct that the ivi television transmissions are made over the Internet, the ivi technology uses a closed system in which the television content is directed specifically and exclusively to paying subscribers. *Id*. ¶5. The ivi content is encrypted and is only decrypted and formatted in small increments shortly before viewing. Thereafter the content is rendered unusable and cannot readily be captured or passed along by consumers. *Id*. The content is not stored in any manner accessible to subscribers, and contrary to the Media Companies' assertions, subscribers cannot copy the television content. *Id*. Indeed, it is much easier to copy content received by traditional cable services using a host of readily available software programs that allow consumers to capture video and post it on websites or otherwise pass it along. *Id*. at ¶7.

The Media Companies characterize the ivi system as an open and notorious violation of the Copyright Act, but that accusation is absurd. They likewise contend that ivi is taking advantage of a technicality or a loophole, but again that is incorrect. The Copyright Act expressly and unmistakably allows companies like ivi to make secondary transmissions of over-the-air broadcasts without the express consent of the Media Companies. Indeed, literally thousands of companies have taken advantage of the same statutory licensing provisions and paid royalties to the Copyright Office in exactly the same way. Bierman Dec. at ¶6. ivi is operating squarely within the boundaries of the law, and the Media Companies cannot

demonstrate a likelihood of success on the merits that would justify the imposition of an injunction.

In order to present an argument that ivi's transmissions are in violation of the Copyright Act, the Media Companies must resort to shrill invectives such as "sham" and "piracy." They also must ignore court decisions, legislative history, and the Copyright Office's practices regarding statutory licenses. Thus, for example, they wholly ignore compelling precedent from courts concerning the breadth of the statutory licensing provisions. They refer to certain pronouncements by the Copyright Office regarding the applicability of the statutory licensing provisions, but they do so selectively. Indeed, the Copyright Office has specifically acknowledged that the statutory licensing provisions are written broadly enough to encompass transmissions of the type that are at issue here. Moreover, the Copyright Office has accepted statutory licensing payments from other companies which, like ivi, have used Internet protocols to make their secondary transmissions of television content. The Copyright Office has *never* issued a rule that excludes Internet transmissions from the statutory licensing provisions. Although the Copyright Office published a Notice of Proposed Rulemaking and subsequent Rule finding satellite transmissions to be outside the scope of the statutory license, the Copyright Office has not done so for the Internet and therefore has not interpreted the statute as excluding Internet transmissions. The applicable court decisions, Copyright Office practices, and other authorities demonstrate that the Media Companies cannot prevail on the merits.

There is also no possibility of irreparable harm. ivi makes its secondary transmissions available only within the United States. The programming content at issue here is literally given away for free by the Media Companies who broadcast it over-the-air for anyone with an antenna to receive it. In accordance with the statutory licensing provisions of the Copyright Act, literally thousands of other companies then receive those primary transmissions and simultaneously retransmit them as secondary transmissions, making the same statutory licensing payments that ivi must make. Adding ivi to this enormous pool of statutory licensees cannot cause irreparable

harm. The Media Companies also describe catastrophic consequences from allowing television on the Internet, but ignore that they are providing the same content on the Internet themselves. Though the Media Companies claim all manner of irreparable harm, none of it is real.

Any balance of the hardships also greatly favors ivi, which would suffer insurmountable harm in the event of an injunction. The issuance of an injunction would shut ivi down, preventing it from any means of income. It would be catastrophic, and the issuance of a preliminary injunction would effectively put ivi out of business, most likely permanently. The harm to the Media Companies, even if there were actual infringement, would be negligible or zero. ivi simply represents one more among thousands of companies who retransmit the same content that the Media Companies give away for free. As they point out, the value of ivi's retransmissions as set by the Copyright Office is about $100 per year. Thus, the harm to ivi by granting an injunction enormously outweighs any possible harm to the Media Companies by denying it, and the motion for an injunction should be denied.

## ARGUMENT

The request for a preliminary injunction should be denied because the Media Companies cannot satisfy the standard set forth in *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (further citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).   In particular, the Media Companies cannot prove likelihood of success on the merits, irreparable harm, a balance of hardships in their favor, or that an injunction is in the public interest.

The Media Companies cite *Salinger* for the proposition that injunctive relief is frequently granted after finding infringement in copyright cases, relying upon an excerpt from Justice Roberts in *eBay*. But *Salinger* further cites Justice Kennedy, responding to Justice Roberts, for the conclusion that in a rapidly changing technological area legal damages may well be sufficient to compensate for infringement, thereby obviating any need for an injunction. *Salinger*, 607 F.3d at 82. In this case the questions of irreparable harm and balance of the hardships are vastly different from an ordinary copyright case because there is a statutory framework both allowing

for the use of the copyrighted materials in question and providing a monetary value for their use. Thus, even if the Media Companies were able to demonstrate likelihood of success on the merits that copyright infringement has occurred, they cannot prove irreparable injury or that the balance of hardships tips in their favor, and the requested injunction should be denied.

I.      ivi's Secondary Transmissions are Licensed under Section 111

The Media Companies recognize that Section 111 of the 1976 Copyright Act permits "cable systems" to make secondary transmissions of television programming. They contend that the statutory license of Section 111 is a limited exception that should be narrowly construed, but they rely upon case authority interpreting a different statute, not Section 111. The Supreme Court has recognized the broader intent of Section 111, noting that it advances the public purposes of rewarding the creators of copyrighted works while promoting broad public availability of those works. *Capital Cities Cable v. Crisp*, 467 U.S. 691, 710, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). In addition, other courts have consistently construed Section 111 very broadly, in keeping with the Congressional and Constitutional intent.

Nor is any restriction imposed by the FCC. The Copyright Act authorizes ivi's transmissions so long as they are "permissible" by the FCC.  The Media Companies erroneously interpret "permissible" to mean that ivi must first gain express permission from the Media Companies or the FCC before making the secondary transmissions. The FCC, however, does not impose such a requirement where the transmissions occur over the Internet. Accordingly, ivi's transmissions are both authorized by the Copyright Act and permissible by the FCC.

A.      ivi is entitled to a statutory license under Section 111

Section 111 of the Copyright Act provides a statutory license for cable systems that receive over-the-air broadcasts and pass them along as secondary transmissions. The relevant portion of Section 111(f)(3) defines a licensed "cable system" as:

> A "cable system" is a facility, located in any State, Territory, Trust Territory, or Possession, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal

> Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service.

ivi's television services fit squarely within Section 111. ivi has a facility located in a State. Weaver Dec. at ¶3. It receives signals transmitted by one or more television broadcast stations, including some of the plaintiffs in this action, who are licensed by the FCC. ivi then makes secondary transmissions of those signals over the Internet, which constitutes "wires, cables, microwaves, or other communications channels." *Id*. ivi also makes its transmissions to subscribing members of the public who pay for the service. *Id*..

Although they cite the full definition of "cable system" and complain that ivi had boiled it down to "wires, cables, microwave, or other communications channels," the Media Companies only vaguely assert that ivi is not a "facility" within the above definition. Rather than pointing to definitional aspects that do not apply to ivi, the Media Companies simply complain that ivi is different from "traditional" cable companies in other ways that are not literally stated in Section 111, such as whether ivi owns its wires and the geographic reach of ivi's transmissions as compared with other cable systems. These issues have nothing to do with Section 111, and ivi fits well within the statutory licensing provisions of Section 111 as a cable system.

### 1. Section 111 should be broadly construed

As originally drafted, the definition of "cable system" was intended to be very broad and to anticipate new technologies that might be used as a means of transmission. The Media Companies erroneously contend that it should be narrowly construed, citing *Fame Publ'g Co. v. Alabama Custom Tape, Inc*., 507 F.2d 667, 670 (5th Cir. 1975). Section 111, however, did not even exist at the time of the *Fame* case, making it wholly inapplicable. Courts interpreting Section 111 have held that "the legislative history supports our conclusion that Congress intended to paint with a broad brush." *Nat'l Broad. Co., Inc. v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467, 1470 n.5 (11th Cir. 1991). Congress understood and intended the statutory license to broadly encompass new technologies beyond the specific configuration of cable companies at

the time. *Id*. Accordingly, the *NBC* court held that Section 111 was broad enough that a satellite television company met the definition of a "cable system." In addition to the *NBC* decision from the Eleventh Circuit, both the Eight Circuit and the Second Circuit have previously held that transmission by "wires, cables or other communications channels" is broad enough to include satellite broadcasts. *See Hubbard Broad. v. Southern Satellite Sys., Inc*, 777 F.2d 393, 401-02 (8th Cir. 1985), *cert. denied*, 479 U.S. 1005 (1986); *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 131 (2d Cir. 1982), *cert. denied*, 459 U.S. 1226 (1983). Surely if a satellite company can be a cable system under Section 111 then transmission over the wires or other communications channels of the Internet must also fit.

ivi recognizes that at about the time of the *NBC* case the Copyright Office issued a Notice of Proposed Rulemaking to the effect that satellite carriers are not cable systems under Section 111. *Cable Compulsory License; Definition of Cable Systems*, 56 Fed.Reg. 31580 (1991); Bierman Dec. at ¶3. Nonetheless, the Congressional intent to "paint with a broad brush" and define "cable system" broadly remains true. The Copyright Office has not issued a similar policy decision governing Internet transmissions, and there is no basis to divert from the Congressional intent to interpret Section 111 broadly.

### 2. Copyright Office practice and reports support application to the Internet

Contrary to the contention of the Media Companies, the Copyright Office has confirmed that Section 111 encompasses secondary transmissions over the Internet. Periodically, the Copyright Office issues reports to Congress on the statutory licensing programs. The Media Companies cite selected excerpts from early Copyright Office reports, but omit key portions of subsequent reports opining that the language of Section 111 allows for secondary transmissions over the Internet. Most recently, the Copyright Office addressed Internet transmissions in the *Satellite Home Viewer Extension and Reauthorization Act Section 109 Report* in June, 2008 (hereinafter, "SHVERA Report"); Bierman Dec. at ¶15. The SHVERA Report observed that in its earlier 1997 Report the Copyright Office had "stated that it was premature to consider

whether the Internet delivery of video programming is covered by Section 111 or for Congress to create a new and separate statutory license for that purpose." SHVERA Report at p. 186. Notably, that 2008 characterization of its earlier report was a retreat from the earlier statements by the Copyright Office, including excerpts quoted by the Media Companies in their brief.

The Copyright Office recognized that Section 111 was drafted to be broad enough to encompass new technologies, and that it would be "patently unfair" to deny the benefits of statutory licensing to such new technologies when they are enjoyed by "traditional" cable companies, satellite carriers, and others. *Id*. at p. 198. Even if the Media Companies are correct that it does not encompass "any and all" new retransmission technologies, it nonetheless covers the technology used for Internet television because there is no statutory basis to exclude it.

The Copyright Office has further acknowledged that some companies such as AT&T are currently using Internet Protocol technology to deliver television services. SHVERA p. 19. AT&T's Internet television service is described by the Copyright Office as being different from "traditional" cable architecture in several ways, including the way programming content is delivered to subscribers. *Id*. at p. 35.  Others such as Verizon are also using technologies characterized as quite different from "traditional" cable, yet AT&T and Verizon are both making statutory licensing payments under Section 111 for their Internet television systems. *Id*. at p. 199. Addressing the AT&T and Verizon systems, the Copyright Office concluded:

> [T]here is nothing in the Act that would clearly foreclose the application of the Section 111 statutory license for the retransmission of distant signals by either company. By its terms, the statutory license applies only to cable systems and Section 111(f) defines "cable system" quite broadly. ***Consequently, both AT&T, as well as Verizon, meet each of the elements of the cable system definition***. *Id*. at p. 199 (emphasis added).

Thus, the Copyright Office has expressly opined that the definition of "cable system" is very broad and that Internet Protocol television falls within Section 111.

The SHVERA Report further describes the AT&T system as one in which the broadcast signals are acquired, processed, encrypted, and encoded at a main facility and then transmitted to

subscribers using Internet Protocols. *Id.* at p. 195. The ivi Internet TV service works the same way. Weaver Dec. at ¶8.   The ivi system also operates within a controlled geographic area and over a secure, closed transmission path in which transmissions are directed to specific subscribers and nonsubscribers cannot gain access to the actual television content. *Id.* at ¶9. If Section 111 covers an Internet Protocol system like AT&T, then it necessarily must also cover the same type of Internet Protocol system used by ivi.

Even beyond AT&T, the Copyright Office has routinely accepted Section 111 royalty payments from other Internet television companies. The Copyright Office publishes listings of companies that have submitted Statements of Account under Section 111. Bierman Dec. at ¶6. Among the listing of companies are many others who offer Internet Protocol television services similar to ivi and AT&T. Bierman Dec. at ¶¶7-12 (citing examples).   In view of the current practices of the Copyright Office and its acknowledgment that Internet Protocol systems meet the elements of the cable system definition, ivi must qualify as well under Section 111.

### 3. There has been no contrary Copyright Office ruling entitled to deference

The Media Companies argue that the Copyright Office's interpretations of Section 111 are entitled to deference and cannot be ignored. An administrative agency's construction may be given deference only where the statute is "silent or ambiguous." *NLRB v. United Flood & Commercial Workers Union, Local 23*, 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987). Conversely, if Congress has directly spoken to the precise question at issue, or if the intent of Congress is clear, it must be given effect and the administrative agency cannot interfere with that intent. *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 897, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983). In this case, Section 111 is not "silent or ambiguous" concerning the definition of "cable system," and Congress has intended it to be construed broadly. As such, there is no need for Copyright Office deference, and any narrow interpretations of Section 111 should be disregarded.

Even if such deference were appropriate, the Copyright Office has issued no interpretations that must be afforded deference. Although the Copyright Office has offered

statements about the scope of Section 111 in its various reports to Congress, such statements are not interpretations of the sort entitled to deference. Rather, only a Copyright Office Rule that is adopted after a Notice of Proposed Rulemaking and an appropriate period for submission and evaluation of public comments would be entitled to deference. *See* 5 U.S.C. § 551(4); *NBC*, 940 F.2d at 1470 n.4 (discussing Copyright Office Rulemaking generally). With respect to Internet television, there has been no such Notice, no Federal Regulation or other such Rule, and nothing issued by the Copyright Office entitled to deference.

Moreover, the informal Copyright Office pronouncements support the applicability of Section 111 to Internet TV. Although its statements have been somewhat inconsistent, most recently the Copyright Office has concluded that it would be patently unfair not to apply Section 111 to new technologies such as those used to transmit television over the Internet, and that the Internet Protocol system of AT&T meets the Section 111 definition. Thus, if deference must be given to any Copyright Office statements, such deference would support the interpretation of Section 111 as encompassing Internet TV.

The Media Companies finally complain that ivi has not sought or obtained any ruling from the Copyright Office confirming that it qualifies for the Section 111 license. That notion has it backward. Companies do not seek rulings or permission to gain a license under Section 111. Rather, they simply submit a Statement of Account to the Register of Copyrights and pay royalties accordingly. 37 CFR § 201.17; 17 USC § 111(d). Any applicable rulings would be the result of a proper notice and commentary period by the Copyright Office, and as explained above, there has been none in this case.

### 4. There is no requirement to build and own the cables or wires

The Media Companies further contend that because ivi does not own all of its wires it cannot fall within Section 111. But this is not an issue recognized by Section 111, and the Media Companies can point to nothing within Section 111 that could conceivably impose a requirement to build and own the cables, wires or other communications channels. Other courts have also

considered and rejected the notion that Section 111 requires a cable system to build and own the wires that carry the secondary transmissions. *NFL v. Insight Communs. Corp.,* 158 F.Supp.2d 124 (D. Mass. 2001) (interpreting Section 111(a)(3) in holding that ownership of the wires is irrelevant because "Nothing in the authorities or legislative history, however, suggest that Congress intended that section to be read in such a crabbed fashion.").

### 5. Case authority confirms the breadth of Section 111

There are very few court decisions addressing the scope of Section 111, and none specifically addressing its applicability to Internet television. Those that have addressed the definition of "cable system," however, have done so broadly in keeping with Congressional intent. *See Nat'l Broad. Co., Inc. v. Satellite Broad. Networks*, *Inc*, 940 F.2d 1467, 1470 n.5 (11th Cir. 1991); *Hubbard Broad. Inc. v. Southern Satellite Sys., Inc.*, 777 F.2d 393, 401-02 (8th Cir. 1985), *cert. denied*, 479 U.S. 1005 (1986); *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 131 (2d Cir. 1982), *cert. denied*, 459 U.S. 1226 (1983).

The Media Companies cite to none of these cases, including the *Eastern Microwave* decision from the Second Circuit. The *Eastern Microwave* decision demonstrates the well-settled recognition that Section 111 is interpreted broadly and that it allows for secondary transmissions across the country to areas remote from the primary transmissions. Indeed, in *Eastern Microwave* the primary transmissions were picked up in New York and conveyed to cable subscribers in Las Vegas and 600 other locations. *Eastern Microwave*, 691 F.2d at 126. The court recognized that media companies have been "at best disenchanted" with the statutory licensing scheme, but held that their remedy lies with Congress, not the Courts. *Eastern Microwave*, 691 F.2d at 133 n.18. As the court concluded, the "public interest thus lies in a continuing supply of varied programming to viewers." *Id*. at 132.

The *NBC* case offered a detailed review of the legislative history, holding that Congress did not intend to limit "cable system" status to "traditional" cable companies that served only local communities. *NBC*, 940 F.2d at 1469-70. As it explained, if Congress meant to do that then

it surely could have defined the term "cable system" more narrowly. *Id.* (noting that, by contrast, Congress did so under 47 U.S.C. § 522(6) in defining "cable system" as a facility that provides video programming to multiple subscribers "within a community").

The Media Companies rely heavily on a subsequent Eleventh Circuit decision for the proposition that the Copyright Office has excluded satellite systems from Section 111 and therefore argue that the Internet must be excluded as well, citing *Satellite Broad. & Comm. Ass'n of Am. v. Oman*, 17 F.3d 344 (11th Cir. 1994). The *Satellite* case, however, is the product of a specific Copyright Office Rule that excludes satellite companies from Section 111 because satellites are not "located in any State" as required in Section 111(f). While the Eleventh Circuit had previously held in the *NBC* case that the language of Section 111 is broad enough to encompass satellite communications, the Copyright Office subsequently issued a Rule specifically saying that it is not. *Cable Compulsory License; Definition of Cable Systems*, 57 Fed. Reg. 3284 (1992); Bierman Dec. at ¶4. Accordingly, the *Satellite* case is limited to the specific question of whether a satellite television company is a "cable system" under Section 111 as a result of the application of the administrative Rule. Despite this specific Rule, no doubt influenced by the contemporaneous passage of the satellite-specific statutory licensing provisions of Section 119, it remains true that Congress intended Section 111 to be construed broadly. Indeed, the Media Companies do not point to legislative history or case authority opposing the holdings of the *NBC* decision as outlined above.

The limited scope of the Eleventh Circuit *Satellite* ruling is further confirmed by the Copyright Office's subsequent statements sixteen years later that it would be "patently unfair" to deny Section 111 coverage to new technologies such as the Internet, and the concession that Internet television companies such as AT&T meet each of the elements of the definition of cable system. Indeed, the Copyright Office has stated that "there is nothing in the Act that would clearly foreclose the application of the Section 111 statutory license for the retransmission of distant broadcast signals" by AT&T and Verizon.  SHVERA Report at p. 199. Notably, the

Copyright Office reached this conclusion even though both companies were described as operating national cable systems transmitting distant signals using an Internet Protocol.

The Media Companies further contend that Section 111 is inapplicable to the Internet because it allows for nationwide retransmissions. Yet the SHVERA Report and the acceptance of AT&T within Section 111 clearly confirm that nationwide retransmission does not place the system outside the scope of Section 111. Indeed, the statutory licensing scheme itself includes payment terms for "distant" transmissions, thereby contemplating that the secondary transmissions will include content that was not originally local.   17 USC § 111(d)(1)(C); Copyright Law Revision, H. R. Rep. No. 94-1476 p. 90-91 (1976); Bierman Dec. at ¶2.

The Media Companies finally point to iCraveTV, noting that a preliminary injunction issued in what it characterizes as a "similar case." *See Twentieth Century Fox Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D. Pa., Feb. 8, 2000). Nothing about iCraveTV is similar to the present dispute. The order quoted by the Media Companies does not mention Section 111, the Communications Act, or any other aspects at issue here. Based on the preliminary injunction, it is impossible to determine whether the decision is in any way similar. The pleadings, however, make it clear that there are key differences rendering the case entirely different and wholly inapplicable. For example, iCraveTV operated from Canada, and Section 111 expressly requires the cable system to be located within the U.S. *See* 17 U.S.C. § 111(f)(3) (requiring the facility to be located in any "State"); *Twentieth Century Fox Film Corp. v. iCraveTV*, Civil Action No. 00-120 (W.D. Pa., Feb. 8, 2000) (Compl. ¶ 3); Bierman Dec. at ¶5. In addition, iCraveTV allegedly modified the primary transmissions by adding advertising and failed to charge subscribers, which also place the transmissions outside Section 111. *Id*. at ¶ 4-6. Considering that many of the Media Companies were involved in the iCraveTV case, it would have been easy for them to more accurately disclose the nature of that case. Quite simply, neither the iCraveTV court nor any other court has ever held that the secondary transmission of broadcast television over the Internet, without more, is outside the scope of Section 111.

### 6. Other alleged policy considerations are unfounded

The Media Companies raise additional policy-based concerns that are unfounded and inapplicable. For example, they argue that allowing Internet-based television will lead to subsequent distribution and piracy. There is no factual basis for such an assertion, and the technology behind the ivi system prevents it. Weaver Dec. at ¶¶5, 9. Conversely, some of the Media Companies themselves already place their own content on the Internet, giving it away for free without encryption. *Id*. at ¶10. For example, using Hulu, television shows from NBC, Fox, ABC, and other sources are provided for viewing on the Internet for free. *Id*. Hulu, a joint venture of some of the Media Companies, seeks to restrict its transmissions to the United States in a manner that appears to be the same as that used by ivi. *Id*. at ¶11. Hulu further makes the television content available on mobile phones and permits content to be emailed to others, thereby doing all of the same things it disingenuously claims to be fearful of. *Id*. at ¶10.

Most, if not all, of the major television networks also make these same television shows available for viewing on the Internet at their own websites such as abc.com, nbc.com, and others. *Id*. at ¶12. Major League Baseball likewise makes available all of its postseason playoff games for viewing on the Internet at mlb.com. *Id*. The notion that ivi has somehow initiated the placement of television content on the Internet and increased the likelihood of piracy or other such distribution is ridiculous considering that the Media Companies themselves are also transmitting the same content over the Internet.

The Media Companies further contend that an interpretation of Section 111 to encompass Internet transmissions would place the U.S. in violation of certain international treaties. Importantly, the statutory licensing provisions of the Copyright Act were passed many decades before any of the treaties in question. The Media Companies do not expressly cite to any of the alleged treaties, nor do they cite any acts of Congress amending Section 111 as a result. Without such a modification by Congress, the treaties in question cannot alter the scope of Section 111. *Clancy v. Office of Foreign Assets Control of the U.S. Dep't of the Treasury*, 2007 U.S. Dist.

LEXIS 29232, *54 n.15 (E.D. Wis., March 31, 2007) (citing *United States v. Lindh*, 212 F.Supp 2d 541 (D. Va. 2002)).  It is insufficient for the Media Companies to vaguely suggest that there may be a treaty problem without providing any legal analysis regarding whether Section 111 should be interpreted any differently in view of any such treaties.

> **B.     Internet television is "permissible" by the FCC**

The secondary transmissions by ivi are also "permissible" by the FCC as required by Section 111. The Media Companies contend that "permissible" means that ivi must seek and expressly receive permission from the FCC, including by following the transmission consent requirements of the FCC even if the FCC does not impose them in the Internet context. The Media Companies are simply incorrect, and ivi's transmissions are permissible by the FCC.

The *NBC* court expressly considered this same issue and held that a rebroadcast is "permissible" so long as no rule or regulation forbids it. *NBC*, 940 F.2d at 1471. The court rejected the argument that "permissible" requires the FCC to affirmatively approve the transmissions. Thus, because existing FCC rules, regulations, and authorizations did not preclude the satellite distribution at issue, it was permissible. *Id*. The same conclusion applies here: ivi's transmissions are within the scope of Section 111 of the Copyright Act so long as nothing in the FCC's regulations preclude them. The Media Companies do not cite any authority for the proposition that Internet television transmissions are regulated by, precluded by, or require affirmative permission from the FCC because there are no such authorities.

Under Section 325 of the Communications Act, an entity that is subject to FCC regulation must seek retransmission consent before making secondary transmissions of original over-the-air primary transmissions. The Media Companies assert that ivi has "refused" to obtain such retransmission consent, but that is false. Although ivi was well aware that the FCC does not regulate the Internet, ivi nonetheless approached many media companies before it began commercial secondary transmissions. Thus, long before invoking the benefits of the statutory license ivi approached many companies to seek consent in the form of specific agreements rather

than the statutory license. Weaver Dec. at ¶14. Consistent with the Media Companies' desire to restrict competition, ivi was turned away. *Id.* Accordingly, if there has been any "refusal" it is in the form of the Media Companies refusing to deal with ivi rather than ivi refusing to discuss the issue of consent.

    The Media Companies also erroneously contend that ivi has refused to comply with FCC rules. Again, despite the fact that ivi knew the Communications Act did not apply to transmissions made over the Internet, ivi nonetheless contacted the FCC to confirm it. Graham Dec. at ¶2. The FCC unmistakably responded that it did not govern the Internet—including the use of the Internet for television transmissions—and therefore no such approvals or licensing were required. *Id.* at ¶¶3-4. Indeed, even at a very basic level, the FCC plainly and openly states on its website, "The FCC does not regulate the Internet or Internet Service Providers." *Id.* at ¶3.

    The Media Companies state that ivi is a "multichannel video programming distributor" (MVPD) and therefore subject to the requirements of Section 325 of the Communications Act, 47 U.S.C. §325. Beyond this simple statement, they offer neither authorities construing Section 325 nor analysis for why it should apply to ivi. The FCC has squarely addressed this issue and concluded that an Internet television company like ivi is ***not*** governed by the FCC. *In re Sky Angel*, 25 FCC Rcd . 3879 (Media Bur. 2010); Bierman Dec. at ¶14. Exactly like ivi, Sky Angel provided a subscription-based service of Internet Protocol Television. Sky Angel did not build or own its own network of wires, but rather provided a service that was available to anyone, nationwide, using the customer's own commercial broadband Internet connection. Sky Angel's television content was largely provided by Discovery Communications, and when Discovery sent a notice of intent to terminate the agreement Sky Angel sought an emergency standstill order from the FCC. The FCC first addressed the threshold issue of whether the transmission of Internet television was subject to the Communications Act. In doing so, the FCC concluded that Sky Angel was not an MVPD (and therefore not regulated by the FCC) because the provision of a transmission path is a necessary element of a "channel" in order to be an

MVPD. As the FCC explained, "Sky Angel does not provide its subscribers with a transmission path; rather, it is the subscriber's Internet service provider that provides the transmission path." *Id*. The same analysis necessarily applies here: ivi cannot be an MVPD for exactly the same reason, and is not subject to the requirements of 47 U.S.C. §325.

In administering the statutory license program, the Copyright Office has also recognized that in some situations an entity may be a "cable system" under Section 111 even if not regulated by the FCC. Thus, in the Copyright Office General Instructions for completing statutory license Statements of Account, the Copyright Office explains that "a system that meets the definition of a cable system is considered a cable system for copyright purposes, *even if the FCC excludes it from being considered a cable system because of the number or nature of its subscribers or the nature of its secondary transmissions*." Bierman Dec. at ¶14 (emphasis added). AT&T likewise has commented to the Copyright Office that there is no linkage between satisfying the eligibility requirements for a cable system under the statutory license of Section 111 and its non-status as a cable system under the Communications Act. Bierman Dec. at ¶15, SHVERA Report at p. 197.

Finally, ivi observes that there are a great many entities providing a wide array of television content on the Internet without seeking or obtaining licenses under the FCC because no such licensing is required. Thus, for example, Hulu.com provides television programming originating with several networks over the Internet, yet Hulu.com is not licensed by the FCC. The same is true for mlb.com, which offers live baseball games on the Internet. Bierman Dec. at ¶16. It is disingenuous, if not knowingly hypocritical, for the Media Companies to accuse ivi of refusing to comply with FCC rules when Hulu.com (a joint venture of some of the Media Companies involved in this action) and Major League Baseball (also involved in this action) likewise operate without FCC regulation.

In their memorandum, the Media Companies simply cite Section 325 and state that it applies. But a closer evaluation of the FCC's practices, statements, and bureau decisions, together with court decisions considering the meaning of the term "permissible" under

Section 111 and the Media Companies' own practices, all confirm that ivi's Internet television system is not subject to retransmission consent under Section 325 of the Communications Act. Accordingly, the Media Companies are not likely to succeed on the merits and their motion should be denied.

## II.     The Media Companies will not suffer irreparable harm

A preliminary injunction is a drastic remedy that should only be granted when the plaintiff will suffer an injury that is "neither remote nor speculative, but actual and imminent." *Grand River Enter. Six nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d. Cir. 2007).  The Media Companies contend that there is irreparable harm in a variety of ways, but all of it is hypothetical and none of it is real, actual, or imminent.

*First*, they argue that there will be "destruction of the value of the licensed programming content." This conclusory notion means nothing more than that ivi is a competitor and, as such, competition may lead to lower prices. Yet this form of competition is the very essence of the statutory license in the first place. Every time any company exercises its rights to a statutory license under Section 111, the Media Companies may have a diminished ability to sell that same content to yet another entity outside the structure of the statutory license. The pricing for use by ivi and other statutory licensees, however, is statutorily fixed. Even if the value of the content is theoretically diminished, that possibility is recognized, protected by the statutory fee structure, and is in the public interest. Any diminution in value of the content is also recovered by the Media Companies because ivi literally pays for its use of the content in the form of the statutory license. Finally, ivi is far too small to be able to "destroy" the value of the content. Indeed, the use of the hyperbolic term "destroy" demonstrates the hypothetical and utterly abstract nature of the Media Companies' argument. Considering that this very content is literally given away by the Media Companies, both on the Internet and over the air, then retransmitted by countless hundreds or thousands of additional cable systems, adding ivi to the mix can scarcely "destroy" the value of the programming content.

***Second***, they argue that there will be disruption of advertising models and loss of revenue. The crux of this argument is that measurement agencies do not currently measure ivi's viewers, and therefore the number of viewers of a program will be undercounted. At the stage of this preliminary injunction motion, the number of viewers for ivi television is too small to pose any sort of undercounting problem, and certainly not large enough to lead to loss of advertising revenue. Moreover, the Media Company witnesses who opine that measuring agencies "will not" measure ivi viewership lack the foundation to make such a statement. To the contrary, the measurement agencies will accept such data and account for it. Weaver Dec. at ¶15. In addition, to the extent such Internet viewership does skew viewer counting, the Media Companies and other entities are already contributing to it. For example, baseball games are available live on mlb.com, thereby disrupting the advertising model to a far greater extent than ivi's television service. Other technologies such as SlingBox (allowing users to individually place content on the Internet), TiVo (allowing users to record programs), and even VCRs make measurements unreliable in the same way. Again, this argument by the Media Companies is purely abstract, unquantified, and hypothetical, and cannot rise to irreparable harm.

In this second argument the Media Companies further contend there will be injury resulting from the ability of consumers to watch programming from distant time zones. This issue has also been considered by the courts and rejected. As the Eleventh Circuit has held, even if this is a "legitimate gripe," protecting the network system's time zone separations "is not a concern of §111." *NBC*, 940 F.2d at 1471 n.7. The court further held that such "concerns are more about communications policy than about copyright infringement and are more appropriately directed to the FCC." *Id*. Because Section 111 does not restrict such distant transmissions—to the contrary, it expressly allows them and charges a higher price for them—there can be no irreparable harm stemming from them.

***Third***, they argue that there will be interference with distribution agreements. This argument is another version of the first argument above that the value of the licensed

programming will be diminished, adding that license agreements must account for Internet distribution. Yet again, the assertion by the Media Companies is purely hypothetical. There are no actual agreements that are mentioned, no specific terms that will be altered, nothing imminent that will occur, and no injury that is particular or real. In addition, the irreparable nature of this sort of interference or disruption is disproven by the Media Companies' own conduct. In recent years, they have increasingly placed their own content on the Internet using network websites such as nbc.com, media websites such as mlb.com, or joint content sites such as Hulu.com. In each case, the introduction of their content to the Internet surely posed some sort of disruption to their existing licensees, yet it could not have been "irreparable."

   ***Fourth***, the Media Companies contend there will be interference with licensed websites. The first component of this argument is that ivi's contemporaneous transmission somehow interferes with the Media Companies' delayed distribution of that same content. If there were anything behind this argument, then every cable system, satellite system, recording device, SlingBox, and on-demand service would also interfere with such websites. The fact of the matter is that this same content is already available in so many ways and in so many places, including the Internet, that ivi's service cannot possibly interfere with any of it. The second component of this argument is that ivi uses a peer-to-peer distribution system that is uncontrolled and has no digital rights management. Thus far, ivi has not engaged in a peer-to-peer distribution system. Weaver Dec. at ¶4. Though ivi may do so in the future, the peer-to-peer model does not in any way allow for further uncontrolled distribution. In addition, the ivi transmission is encrypted and uses technological features that prevent uncontrolled distribution. Indeed, the ivi system is far more controlled than the current Internet distributions already made by the Media Companies themselves, such as Hulu.com which freely allows users to email videos to others. Weaver Dec. at ¶¶5, 7, 10. As with the above arguments by the Media Companies, this unfounded, hypothetical, and non-specific assertion does not establish irreparable harm.

*Fifth*, they argue there will be disruption of foreign markets. Initially, ivi has made public statements to the effect that its technology allows for worldwide distribution.  Currently, ivi does transmit some television content outside the U.S., but that does ***not*** involve any of the content at issue here and ivi tightly restricts its Section 111 secondary transmissions to the U.S. only. Weaver Dec. at  ¶¶4, 9. ivi does not use credit card billing addresses, phone numbers, or zip codes entered by the user as indicia of geographical location. Rather, ivi uses a much sounder technological means for restricting access. *Id*. at ¶9. ivi further objects that the Media Companies' basis for asserting that ivi is available worldwide lacks foundation and is hearsay.

*Sixth*, the Media Companies argue there will be loss of control over the content and "viral infringement." As noted above, the ivi system uses rigorous technological features that make such piracy exceedingly unlikely. Weaver Dec. at ¶5, 9.  Even if it was somehow possible, it would not constitute irreparable harm because the Media Companies themselves already make this possible. As noted above, the Media Companies admit that they also place much of the same content on the Internet through their own websites. As merely one example, the Media-company controlled Hulu website specifically allows users to email videos to others. *Id*. at ¶10. As they explain, most of the videos they offer can be passed along in this manner. *Id*.  It is ridiculously disingenuous to complain that they will lose control over the content when they are facilitating an even greater ability for the public to pass the content freely along.

It is also exceedingly easy for any consumer to place the same content on the Internet using Windows Media Player or other standard software that is included on personal computers. Indeed, given the widespread use of YouTube as a medium for uploading television content to the Internet long before the existence of ivi, it is nonsensical to contend that ivi's controlled, encrypted television service will lead to irreparable harm through further copying and distribution. Weaver Dec. at  ¶13. The ivi system cannot possibly make "viral infringement" any more likely than it already is based on the Media Companies' own practices.

Nor is there any genuine concern about picture quality. ivi distributes its television content in standard definition, although in some cases the available bandwidth may make it preferable to display a somewhat lower quality image. *Id*. at ¶6. The Media Companies place their television content on the Internet in the same way, admittedly stating that they adjust the video stream to account for the abilities of the Internet connection. *Id*. In any event, the Media Companies do not and cannot claim that ivi's service is of poor quality.

Beyond these bullet-pointed arguments, the Media Companies argue that injunctive relief is necessary because of the difficulty in quantifying the damages. There is a difference between being unable to quantify damages and being unable to articulate them. In this case, the Media Companies are unable to articulate them and can only point to vague, conclusory, hypothetical arguments that do not prove to be true. Assuming that they were able to prove copyright infringement in this case, the amount of damages would be extremely easy to determine. The Copyright Act already includes a statutory license schedule that establishes the value associated with the secondary transmission of the television content. By their own admission, the Media Companies contend that it amounts to about $100 per year for ivi. Even if the statutory schedule was set at below market rates, it cannot be a tenfold reduction from market rates. *See* SHVERA Report at p. 67. Thus, in this case damages would be extremely easy to determine, would be quite low, and could readily be paid by ivi.

The Media Companies also contend that the inability to pay damages also supports entry of an injunction. asserting the possibility of significant statutory damages. This is an issue that must be proven by the Media Companies, however, and they offer no evidence whatsoever. They vaguely contend that there may be hundreds of works at issue, but offer no evidence related to ivi's actual ability to pay a judgment at trial. As such, this argument should be rejected. *Synergy Advanced Pharms., Inc. v. CapeBio*, LLC, 2010 U.S.Dist.LEXIS 53252, *20 n.58 (S.D.N.Y. June 1, 2010).

In sum, there is no irreparable harm whatsoever. Every asserted harm is remote and speculative, and none is real or imminent. Each so-called harm is also the same that the Media Companies would experience as a result of any company exercising its right to take a statutory license. Though the Media Companies may be "at best disenchanted" with the statutory license provisions, their dissatisfaction does not amount to irreparable harm.

## III.     The balance of the hardships favors ivi

The balance of the hardships also favors ivi. The Media Companies contend that ivi would not face any real harm in "delaying the launch" of their service until after a final adjudication on the merits. That proposition is unsupported and is false. As the Media Companies surely recognize, a preliminary injunction would shut down ivi's entire business, foreclosing any ability to generate any revenue during the pendency of the litigation. Weaver Dec. at ¶16. It is not merely a disruption, but rather a complete shuttering of the business. Customers would leave for other alternatives and likely would not return after ivi prevails at trial.

The Media Companies contend that ivi is not receiving any revenue because its subscribers are still in the 30 day free trial period. Though that was true when the motion was first filed, it is no longer true at this point. The ivi service has been active for more than 30 days, and it is therefore inaccurate to contend that ivi is not even receiving any revenue for its service.

By contrast, and as noted above, the Media Companies will suffer no harm at all—certainly nothing that is real or imminent. Their arguments amount to conclusory assertions that cannot outweigh—let alone "decidedly" outweigh, as the law requires—the harm to ivi in the event an injunction issues.

## IV.     An injunction would not be in the public interest

The Second Circuit has previously recognized that the "public interest thus lies in a continuing supply of varied programming to viewers." *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 132 (2d Cir. 1982), *cert. den.*, 459 U.S. 1226 (1983). The Supreme Court has likewise taken a broad view of the statutory licensing provisions, noting that the

statutory license of Section 111 advances the public purposes of rewarding the creators of copyrighted works while promoting broad public availability of those works. *Capital Cities Cable v. Crisp*, 467 U.S. 691, 710, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).  The very purpose of the statutory license of Section 111 is therefore to advance the public interest. Through the enactment of Section 111, Congress recognized that it would be impossible for companies like ivi to secure permission from each of the copyright owners in advance, and that the public interest of broad dissemination could only be advanced by a statutory license.  Though the Media Companies may not like the statutory license, and may be able to articulate reasons why they individually do not benefit from it, Congress adopted the statute to strike a balance between compensating authors for their works while ensuring that they are available as broadly as possible. An injunction that would prevent ivi from making secondary transmissions in accordance with the statutory license of Section 111 would be decidedly against the public interest and should be denied.

## V.      Conclusion

The motion for preliminary injunction or temporary restraining order should be denied.

RESPECTFULLY SUBMITTED this 22nd day of October, 2010.

BLACK LOWE & GRAHAM[PLLC]

_____

Lawrence D. Graham, WSBA No. 25,402
 Email: graham@blacklaw.com
Ellen M. Bierman, WSBA No. 23,224
 Email: bierman@blacklaw.com
701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
T: 206.381.3300
F: 206.381.3301