UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

WPIX, INC.,
WNET.ORG,
AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC.,
CBS BROADCASTING INC.,
CBS STUDIOS INC.,
THE CW TELEVISION STATIONS INC.,
NBC UNIVERSAL, INC.,
NBC STUDIOS, INC.,
UNIVERSAL NETWORK TELEVISION, LLC,
TELEMUNDO NETWORK GROUP LLC.,
NBC TELEMUNDO LICENSE COMPANY,
OFFICE OF THE COMMISSIONER OF BASEBALL,
MLB ADVANCED MEDIA, L.P.,
COX MEDIA GROUP, INC.,
FISHER BROADCASTING-SEATTLE TV, L.L.C.,
TWENTIETH CENTURY FOX FILM CORPORATION,
FOX TELEVISION STATIONS, INC.,
TRIBUNE TELEVISION HOLDINGS, INC.,
TRIBUNE TELEVISION NORTHWEST, INC.,
UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP,
TELEFUTURA NETWORK,
WGBH EDUCATIONAL FOUNDATION,
THIRTEEN,
and PUBLIC BROADCASTING SERVICE,

     Plaintiffs,

     v.                                                                                               10 Civ. 07415-NRB

IVI, INC. and TODD WEAVER,

     Defendants.

------------------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

Under ivi's view of Section 111, *anyone* with a computer, an Internet connection and a TV antenna can become a "cable system" entitled to compulsory licensing; anyone may sell for profit over the Internet to subscribers nationwide (indeed worldwide) access to multiple broadcast television stations and hundreds of copyrighted television programs on those stations each and every day, seven days a week -- without obtaining any authorization, licenses or consent from anyone to do so, without being subject to any regulation of any sort by any governmental body and without having any control over the distribution network being used to deliver the copyrighted programming. All that is necessary, in ivi's view, is the payment of $100 annually to the Copyright Office.

Congress never intended such a result when it adopted the Section 111 license in 1976. As discussed below, Congress accorded compulsory licensing to a highly regulated and localized cable industry that developed and controlled (at great cost) its own infrastructure -- and that, in Congress' view, would not have been able to provide diverse programming to the communities they were franchised to serve absent a compulsory license. The language and legislative history of Section 111, the pronouncements of the Register of Copyrights (the government official entrusted by Congress with administering the Section 111 license (*see* Pl. Memo. at 9), sound policy considerations and common sense make clear that ivi has failed to carry its burden of excusing its massive infringement of copyrighted programming. *See* Pl. Memo. at 7-8 (discussing ivi's burden).

ivi's acknowledged goal is to disrupt the means by which broadcast programming reaches the public. Indeed, ivi accompanied the lawsuit it filed in Seattle against so-called "big media" with a press release claiming that its service would be "highly disruptive" to the entire media industry. *See* Pl. Memo. Morrow Decl., Ex. 7. And ivi publicly boasted that it would "eat the lunch" of those cable and satellite operators who must comply with existing rules. *See* Pl. Memo. Morrow Decl., Ex. 5. If not enjoined, ivi's will make countless unauthorized performances of plaintiffs' copyrighted works, which cannot be undone after

1

the fact; and it would severely disrupt existing markets, as ivi admittedly intends, causing irreparable harm to plaintiffs. In addition, if ivi is not enjoined, many others will flock to ivi's fabricated "rule free zone" – as has already started to occur (*see* Pl. Memo. at 3 n.1) -- and begin selling for a profit over the Internet plaintiffs' valuable copyrighted programming. A preliminary injunction is necessary to prevent further harm, and to preserve that status quo pending a final determination on the merits.

1. ivi says the Copyright Office has "confirmed that Section 111 encompasses secondary transmissions over the Internet." ivi Opp. at 8. To the contrary, the Register of Copyrights testified before Congress, unequivocally, that the streaming of broadcast programming to subscribers nationwide over the Internet does *not* qualify for the cable compulsory license:

> [T]he cable compulsory license could not reasonably be interpreted to include Internet retransmissions . . . . I believe that the section 111 license does not and should not apply to Internet transmissions . . . . [I]f there is to be a compulsory license covering such retransmissions, it will have to come from newly enacted legislation and not existing law.

Statement of *See* H.R. Rep. 94-1476 at 89 Register of Copyrights Before the House Subcommittee on Courts, and Intellectual Property, 106th Cong., 2d Sess., at p. 9 (June 15, 2000) (Declaration of Scott Morrow ("Morrow Reply Decl."), Ex. 1.)

ivi ignores this testimony and, instead, provides the Court with selected pages from the Register's 2008 Section 109 Report, claiming that the Copyright Office "retreated" from its position. Opp. at 9. That claim is baseless. As the Section 109 Report makes clear:

> The Office continues to oppose an Internet statutory license that would permit any website on the Internet to retransmit television programming without the consent of the copyright owner. Such a measure, if enacted, would effectively wrest control away from program producers who make significant investments in content and who power the creative engine in the U.S. economy. In addition, a government-mandated Internet license would likely undercut private negotiations leaving content owners with relatively little bargaining power in the distribution of broadcast programming. Further, there is no proof that the Internet video market is failing to thrive and is in need of government assistance through a licensing system. In fact, the lack of a statutory license provides an incentive for

> parties to find new ways to bring broadcast programming to the marketplace and that market, by all accounts, continues to grow.

Register's Sec. 109 Report, at 188 (Pl. Memo, Morrow Decl., Ex. 10).

ivi confuses the distinction between the "Internet," on the one hand, and use of "Internet Protocol" ("IP") to deliver video programming ("IPTV"), on the other hand. The Internet is a global system of millions of interconnected private, public, academic, business and government computer networks, to which content providers and end-users connect using their own respective Internet Service Providers ("ISP.") IPTV is a term for a transmission protocol or format in which video is delivered in digital "packets" that include an IP address header. Despite the inclusion of the word "Internet" in the term and consistent with ivi's own examples, IPTV-formatted video is typically delivered through a closed, "end-to-end" system in which the distributor owns and/or controls the wires and routers in the entire delivery network at every point, including the "last mile" to the subscriber's home. Unlike ivi, these services that deliver IPTV-formatted video do not relinquish control over the content and distribution path to the user's ISP and the other worldwide interconnected networks that form the public Internet.

The Register recognized these important distinctions in determining Section 111 eligibility. The Register concluded that the retransmission of programming using IP technology is a new and competitive technology that does not in and of itself make a service ineligible for the Section 111 license. *See* Register's Section 109 Report at xi-xii & 194-200. However, a service such as ivi's that chooses to stream programming over the public Internet (regardless of whether it uses IPTV or some other format) is not eligible for the Section 111 license. *See id.* at xii & 181-89. As the Register explained, use of IPTV as a new distribution technology does not raise any issues that would have concerned Congress in enacting Section 111. But the use of the Internet to distribute programming is quite different because, as the Register noted, the Internet is wholly unregulated, poses serious questions about signal security, reflects none of the market failures that justified the original

3

Section 111 compulsory license and is the subject of separate international treaty obligations which prohibit retransmissions of broadcast programming over the Internet. *See id.* ivi claims it is unclear which specific treaties would be violated (Opp. at 15-16) but the Register identifies them on pages 188-89 of her Section 109 Report.

    2.    ivi argues that the Copyright Office has not issued "any interpretations" or "rulings" concerning the Internet that should be accorded "deference." Opp. at 10-11. But the Register has expressed the consistent view -- for over ten years -- in testimony and reports to Congress that Internet services such as ivi's are not and should not be eligible for the Section 111 compulsory license. During that period, Congress has amended the Copyright Act (including Section 111) on several occasions, without expressing any disagreement with the Register's view. The Register's interpretation of the Section 111 license is entitled to deference. *See Utah v. Evans*, 536 U.S. 452, 472 (2002) (Court would accord deference to an administrative agency's interpretation of a statute where Congress was aware of that interpretation and re-enacted the statute without change).

Furthermore, the Register has ruled that a service providing broadcast programming to subscribers nationwide (let alone internationally, as ivi has done) does not qualify for the Section 111 license:

> The Office notes that at the time Congress created the cable compulsory license, the FCC regulated the cable industry as a highly localized medium of limited availability, suggesting that Congress, cognizant of the FCC's regulations and the market realities, fashioned a compulsory license with a local rather than a national scope. This being so, the Office retains the position that a provider of broadcast signals be an inherently localized transmission media of limited availability to qualify as a cable system. 56 FR 31595 (July 11,1991).

62 Fed. Reg. 18705, 18707 (April 17, 1997) (Morrow Reply Decl., Ex. 2). *See also* 57 Fed. Reg. 3284, 3292 (January 29, 1992) (Bierman Decl., Ex. 6) ("It is apparent that the operation of section 111 is hinged on the FCC rules regulating the cable industry. . . . Nothing in the statute or its legislative history suggests that Congress intended section 111 to apply to nationwide retransmission services such as satellite carriers . . ."). That ruling, to

which a federal court of appeals afforded deference in the context of another nationwide service found ineligible for Section 111 (satellite carriers), also leaves no doubt that ivi is ineligible for the Section 111 license. *See SBCA v. Oman,* 17 F.3d 344 (11th Cir. 1994).

ivi states that "if a satellite company can be a cable system under Section 111," then surely "transmissions over the wires or other communications channels of the Internet must also fit." Opp. at 8. But satellite companies are *not* "cable systems" under Section 111. Only by repeatedly, and improperly, citing a 1991 Eleventh Circuit decision -- that the Eleventh Circuit expressly superseded in 1994 when it affirmed the Register's contrary ruling in *SBCA v. Oman, supra* -- can ivi make such an erroneous statement. *See* Pl. Memo. at 11-12.[1]

ivi also cites the *Eastern Microwave* and *Hubbard* decisions that, it says, "addressed the definition of 'cable system'" and did so "broadly" to include retransmissions of New York signals to "cable subscribers in Las Vegas and 600 other locations." Opp. at 12. And ivi claims the *Insight* decision "considered and rejected the notion that Section 111 requires a cable system to build and own the wires." *Id.* But none of these decisions involved a dispute over the meaning of "cable system" or the scope of the Section 111 cable compulsory license, and none of the defendants in these cases sought to retransmit television programming directly to subscribers. The common issue was whether the defendants, who transported programming to cable systems at the request of those systems, qualified as "passive carriers" within the meaning of an entirely different portion of Section 111, 17 U.S.C. § 111(a)(3). ivi does not seek to rely upon the "passive carrier" license in Section

---

[1] Congress has created separate compulsory licenses under the Copyright Act for the retransmission of broadcast television programming by satellite carriers in Section 119 (for distant station signals) and Section 122 (for local signals). *See* Pl. Memo. at 12 n.4. In enacting the Section 119 license, Congress took account of the nationwide scope of the satellite industry by including provisions designed to protect the exclusivity of local network affiliates by limiting the importation of duplicating network programming from distant markets. *See* 17 USC § 119(a)(2)(B); *CBS Broadcasting Inc. v EchoStar Communs. Corp.*, 450 F3d 505 (11th Cir. 2006). Although ivi's service is also distributed on a nationwide basis, the Section 111 license to which it claims entitlement includes no such protections for the exclusivity rights of local television stations, and ivi asserts it is exempt from the companion FCC rules providing those protections.

5

111(a)(3), nor could it. Indeed, in a decision from this Court not cited by ivi, Judge Kaplan concluded that another service that sought to retransmit radio signals directly to subscribers nationwide over telephone lines did not qualify for Section 111(a)(3), presciently noting:

> This view is supported by "'the "common sense' of the statute . . . and the practical consequences of the suggested interpretations,'" considerations which the Court is obliged to take into account. . . . We live in an era of rapid technological change. The possibilities for the capture and retransmission of copyrighted material over the Internet, for example, are enormous. . . . Holding that Kirkwood is a "carrier," notwithstanding that the essence of his business is the retransmission of copyrighted materials, would threaten considerable mischief.

*Infinity Broadcasting Corp. v. Kirkwood*, 63 F. Supp. 2d 420, 426 (S.D.N.Y. 1999).

    3.    ivi's references to various Section 111 licensees that utilize IPTV technology to distribute programming (*see* Opp. at 9-10) provide no support for ivi and instead only confirm the distinction between those licensees and ivi itself. The licensees to which ivi refers provide service to discrete local communities via an infrastructure and closed private network that it controls all the way up to the subscriber's home; none provides a nationwide service over the Internet as does ivi. *See, e.g.* Bierman Decl., Ex. 11 (identifying areas served by Arkwest TV); Bierman Decl., Ex. 13 (same for SureWest). While ivi provides the instructions for completing the statements of account that cable operators file with the Copyright Office (Bierman Decl., Ex. 14), it never provides any of the actual statements of account -- each of which reflects the highly localized and private nature of the service being provided by IPTV cable systems to which it refers. *See, e.g.,* Morrow Reply Decl. Exhibits 3, 4 & 5 (statements of account for ArkWest and Sure West) (identifying in Space D "each separate community served by the cable system").

ivi's repeated attempts to equate its service with AT&T's U-verse service are unavailing. ivi is nothing like AT&T, which uses IP technology to transmit video over a closed, secure, private network that it owns and controls from end-to-end. AT&T does not provide a nationwide service as does ivi, but rather serves local areas. Importantly, AT&T also has entered into retransmission consent agreements with each of the broadcasters whose

stations it retransmits, unlike ivi. The Register has recognized the critical distinction between AT&T's U-verse service, on the one hand, and a service like ivi's, on the other, which streams programming to subscribers nationwide over the Internet. *See* Register's Section 109 Report at 181-89 & 194-200.

4. ivi claims it falls "squarely within" all the "definitional aspects" of Section 111(f)) but then provides a truncated version of this definition. *See* Opp. at 6-7. The complete text is as follows:

> A "cable system" is a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. *For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.*

17 U.S.C. § 111(f)(3). The italicized language that ivi omitted from its opposition is language on which the Register relied to support the conclusion that Section 111 does not apply to nationwide retransmission services. As the Register explained, terms such as "head end" and "contiguous communities" in Section 111(f) simply have no relevance to entities (like satellite carriers and ivi) that provide the same service to subscribers located nationwide. *See* 57 Fed. Reg. at 3290 ("[S]ection 111 is clearly directed at localized transmission services. The second part of the section 111(f) definition of a cable system refers to 'headends' and 'contiguous communities,' two concepts which do not have any application to a nationwide retransmission service such as satellite carriers"); *id.* (discussing definition of "distant signal equivalent" in Section 111(f) which also has no application to a nationwide service). This conclusion is further supported by the reference to "any State, territory, trust territory or possession" in the first sentence of the definition. A nationwide service is simply not a "cable system."

Furthermore, under the Section 111(f) definition, the "facility" must receive and make the secondary transmissions. Therefore, in ivi's case the "facility" at issue is not simply its server but also the millions of computers that make up the Internet itself. It is that network of computers -- which are located throughout the world and not just in "any State, trust, territory or possession" and which are not under ivi's control -- that completes the "secondary transmissions" to "subscribing members of the public." Indeed, ivi says that under the FCC staff's *SkyAngel* decision, 25 FCC Rcd. 38879 (Media Bur. 2010), it is ivi's ISP and not ivi that provides the requisite "transmission path" and delivers the programming to the ultimate user. Opp. at 17-18. If that decision and ivi's reliance upon it are correct (which are neither conceded not disputed), that provides further support for the conclusion that ivi is not a cable system under Section 111.

Finally, as the Register has noted, one must look to the language of the entire Section 111 (and not simply the Section 111(f) definition) to determine whether a particular service qualifies for the compulsory license. *See* 62 Fed. Reg. at 18707 ("[S]ection 111 must be construed in accordance with Congressional intent and as a whole, not just in reference to one particular section"); Pl. Memo. at 12. As the Register concluded:

> § 111, taken as a whole, demonstrates that Congress intended to create a compulsory license only for local entities. There are numerous references to cable systems as local facilities. For example, § 111 refers to agreements between a cable system and a television broadcast station "in the area in which the cable system is located," and to television stations "within whose local service area the cable system is located." Similarly, the definition of "cable system" refers to the rules applicable to cable systems "in contiguous communities." Finally, the retransmission of Canadian broadcast signals depends on whether "the community of the cable system is located more than 150 miles from the United States-Canadian border." These references would have no meaning when applied to the nationwide retransmission facilities employed by satellite carriers.

56 Fed. Reg. 31580, 31588 (July 11, 1991) (Bierman Decl., Ex. 5). Consideration of the same statutory provisions supports the conclusion that ivi is ineligible for compulsory licensing.

5.   ivi's repeated references to the fact that certain of the plaintiffs themselves make some of their own programming available on the Internet through services such as Hulu.com or

8

mlb.com (ivi Opp. at 18, 20 & 21) are inapposite. ivi ignores the fact that plaintiffs do so pursuant to negotiated licenses and/or through Internet sites that they own. By doing so, they obtain not only fair market compensation but also are able to ensure the security of the transmission channels and the quality of the programming that they distribute and to impose other relevant conditions -- considerations wholly absent with ivi. Moreover, the notion that plaintiffs' choice to license their own copyrighted content in this manner somehow renders an operator like ivi free to take and to distribute the same programming on an unlicensed and wholly unregulated basis makes no sense.

6.   ivi's request for the Court to construe Section 111 "broadly" (Opp. at 7-8) also fails. *See Tasini v. New York Times, Inc.*, 206 F.3d 161, 168 (2d Cir. 2000) ("when a statute sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the [provision]'") (*quoting Commissioner v. Clark*, 489 U.S. 726, 739 (1989)), *aff'd on other grounds NY Times Co. v. Tabini*, 533 U.S. 483 (2001).

ivi says Congress concluded that the public interest would be served by allowing "cable systems" to retransmit broadcast programming pursuant to a compulsory license. But Congress reached that conclusion because it believed at the time there was a market failure with regard to licensing of cable retransmission of broadcast signals. *See* H.R. Rep. 94-1476, at 89 (1976). Congress also reached that conclusion only with respect to "cable systems" and cautioned that it was doing so in part because of the highly regulated nature of the existing cable industry:

> [T]here is no simple answer to the cable-copyright controversy. In particular, any statutory scheme that imposes copyright liability on cable television systems must take account of the intricate and complicated rules and regulations adopted by the Federal Communications Commission to govern the cable industry.

*Id.* (Bierman Decl., Ex. 4).

There is no support for the notion that Congress intended the Section 111 license to be construed so broadly as to apply to the unregulated retransmission of broadcast signals or to new technologies for which there exists a functioning market for licensing those same rights. The existence of Hulu, iTunes, mlb.com, and other similar sites and services (Opp. at 18)

9

demonstrates that there is a robust, functioning market for the licensing of Internet retransmissions of broadcast programming. *See supra* pages 2-3 & 8-9.

Had Congress determined that the public interest would be served by having anyone and everyone retransmit broadcast programming, it could easily have written Section 111 to accomplish that result. Every new technology (including, for example, satellite carriers and, more recently, digital broadcasters capable of transmitting multiple program streams) and, indeed, every individual with a computer and Internet access would be able to avail themselves of compulsory licensing. But Congress did not do so. It accorded the compulsory license to the industry that it knew and adopted a simple definition of cable system tailored to that industry. As the Register of Copyrights has repeatedly and correctly observed,

> Congress did not intend to extend the cable compulsory license to every video delivery system capable of retransmitting broadcast signals to subscribers. The cable compulsory license was the subject of intensive debate and controversy from 1966 to 1976. Nothing in the legislative history suggests that Congress intended an open-ended definition of the entities qualifying for the license.

56 Fed. Reg. at 31592; *see also* 56 Fed. Reg. at 31590 (Section 111 "should not be given a wide scale interpretation which could, or will, encompass any and all new forms of retransmission technology. An overbroad interpretation exceeds the intent of Congress in creating the compulsory license as a response to a specific legislative policy issue").

ivi is unlike any other service ever found eligible for the Section 111 cable compulsory license. It admits it streams broadcast signals and the programming on those signals to subscribers *nationwide* over the Internet making use of a network of computers located throughout the world -- a distribution network that ivi did not develop and over which ivi has no control; ivi also claims it is subject to no regulation whatsoever and that it is not required to obtain consent from copyright owners, TV stations, or anyone else to offer its service. This combination of factors places ivi squarely outside the compulsory license that Congress intended for a different type category of service. *See* Register's Section 109 Report at 181 (only services that are "substantially similar" to systems using the Section 111 license should qualify for 111).

By: _/s/ Peter L. Zimroth_
Peter L. Zimroth
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York
(212) 715-1000
*peter.zimroth@aporter.com*

-- and --

Robert Alan Garrett
Hadrian R. Katz
C. Scott Morrow
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000
*robert.garrett@aporter.com*
*hadrian.katz@aporter.com*
*scott.morrow@aporter.com*
*Counsel for Plaintiffs*

Dated: October 29, 2010

11