UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
WPIX, Inc.,
WNET.ORG,
AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC.,                          **MEMORANDUM AND**
CBS BROADCASTING INC,                              **O R D E R**
CBS STUDIOS INC.,
THE CW TELEVISION STATIONS INC.,                   10 Civ. 7415 (NRB)
NBC UNIVERSAL, INC.,
NBC STUDIOS, INC.,
UNIVERSAL NETWORK TELEVISION,LLC,
TELEMUNDO NETWORK GROUP LLC,
NBC TELEMUNDO LICENSE COMPANY,
OFFICE OF THE COMMISSIONER OF BASEBALL,
MLB ADVANCED MEDIA, L.P.,
COX MEDIA GROUP, INC.,
FISHER BROADCASTING-SEATTLE TV, L.L.C.,
TWENTIETH CENTURY FOX FILM CORPORATION,
FOX TELEVISION STATIONS, INC.,
TRIBUNE TELEVISION HOLDINGS, INC.,
TRIBUNE TELEVISION NORTHWEST, INC.,
UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP,
TELEFUTURA NETWORK,
WGBJ EDUCATIONAL FOUNDATION,
THIRTEEN,
And PUBLIC BROADCASTING SERVICE,

                          Plaintiffs,

               - against -

ivi, Inc. and Todd Weaver,

                          Defendants.
-----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


        Plaintiffs,    major    copyright    owners    in    television

programming, have moved to preliminarily enjoin defendants ivi,

Inc. ("ivi," with a lowercase "i") and its chief executive officer, Todd Weaver ("Weaver"), from streaming plaintiffs' copyrighted television programming over the Internet without their consent. Since plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm should the injunction not be granted, a balance of hardships weighing in their favor, and that the public interest will not be disserved by an injunction, the motion is granted.

## FACTS

Plaintiffs are leading producers and owners of copyrighted television programming, including (1) broadcast television networks (ABC, CBS, CW, FOX, NBC, Telefutura, Telemundo, and Univision), (2) distributors of non-commercial education programming (PBS, WNET.ORG, and WGBH), (3) a major professional sports league (Major League Baseball), (4) top motion picture studios (Walt Disney Studios, 20th Century Fox, and NBC Universal), and (5) individual New York and Seattle broadcast television stations owned and operated by the named plaintiffs[1] (WPIX, WNET, WABC, WCBS, WNBC, WNYW, WWOR, WNJU, WXTV, WFUT, KIRO, KOMO, KZJO, KSTW, and KCPQ). Plaintiffs spend millions of dollars each year to create copyrighted programming. They utilize several avenues to exploit their works for profit,

---

[1] The complaint details which named plaintiff owns and operates each of these stations. See Compl. ¶¶ 12-38.

including distribution agreements with licensed websites and cable operators, performance on their own websites, and advertising revenue.

ivi is a company that captures over-the-air broadcasts of plaintiffs' programming and simultaneously, without plaintiffs' consent, streams those broadcast signals over the Internet to subscribers who have downloaded the ivi TV player. Declaration of Todd Weaver in Opposition to Motion for Preliminary Injunction ("Weaver Decl.") ¶¶ 2-3. Specifically, ivi captures signals transmitted by FCC-licensed broadcast stations in Seattle, New York, Chicago, and Los Angeles. Weaver Decl. ¶ 3; Transcript of Oral Argument ("Transcript") at 3.[2] For $4.99 per month, and an additional $.99 for the ability to pause, rewind, and fast-forward, subscribers located anywhere in the United States can view the programming simultaneously being offered by the networks' affiliates in Seattle, New York, Chicago, and Los Angeles through any Internet-capable device. According to defendants, ivi uses equipment to determine the actual location of the computer operating the ivi TV player, and does not offer

---

[2] ivi began its service on September 13, 2010, by retransmitting signals from Seattle and New York. At the time of briefing, ivi had publicly announced their intentions to expand to other markets, including Los Angeles, Chicago, and San Francisco. Plaintiffs' Memorandum of Law in Support of Preliminary Injunction ("Pls.' Mem.") at 4. At oral argument, the Court confirmed that Chicago and Los Angeles had been added to ivi's roster.

plaintiffs' programming to those outside the United States. Weaver Decl. ¶ 9.

ivi's service is limited to the simultaneous retransmission over the Internet of plaintiffs' copyrighted programming in real time. According to defendants, ivi operates through a "closed" system in which the programming is provided exclusively to its paying subscribers. The content is "encrypted and only decrypted and formatted in small increments shortly before viewing by ivi subscribers. Thereafter the content is rendered unusable, removed, and cannot readily be captured or passed along by consumers." Weaver Decl. ¶ 5.

A significant difference between watching programming through ivi rather than on a traditional television is that instead of only being able to access what is currently being offered by the viewer's local stations, ivi's customers can watch whatever is being aired at that moment by the networks' affiliates in New York, Los Angeles, Chicago, or Seattle.

Defendants do not obtain plaintiffs' consent to use their programming, unlike traditional cable operators who are obligated to acquire retransmission consent under the Communications Act, 47 U.S.C. § 325.

After sending several cease-and-desist letters, plaintiffs brought the instant suit objecting to the unsanctioned public performance of their copyrighted works.

4

### STATUTORY TEXT AND DEFENDANTS' ARGUMENT

Defendants claim that they are entitled to a compulsory license to perform plaintiffs' programming pursuant to Section 111 of the Copyright Act, 17 U.S.C. § 111 ("Section 111"). This statute allows "cable systems" in compliance with the rules and regulations of the FCC to perform plaintiffs' programming as long as they make payments to the Copyright Office as determined by the statute.

Section 111(c)(1) of the Copyright Act provides that, subject to certain conditions:

> "[S]econdary transmissions to the public by a cable system of a performance or display of a work embodied in a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico shall be subject to statutory licensing upon compliance with [record keeping and royalty fee requirements] where the carriage of signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission."

17 U.S.C. § 111(c)(1). The statute later defines "cable system" as:

> "[A] facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous

communities under common ownership or control or operating from one headend shall be considered as one system."

17 U.S.C. § 111(f)(3).

Defendants argue[3] that ivi fits within the statutory definition of a cable system under the Copyright Act. Further, while acknowledging that ivi does not comply with the "rules, regulations, or authorizations of the Federal Communications Commission ("FCC")," they claim that its transmissions are "permissible" under these rules because they occur over the Internet, which the FCC does not regulate. In other words, defendants argue that ivi is a cable system for purposes of the Copyright Act, and thus may take advantage of the compulsory license, but that it is not a cable system for purposes of the Communications Act, and thus it need not comply with the requirements of that Act and the rules of the FCC promulgated thereunder.

To place defendants' argument in a real world context, they assert that for the payment of approximately $100 a year to the Copyright Office (the payment for a Section 111 compulsory license) and without compliance with the strictures of the Communications Act or plaintiffs' consent, that they are

---

[3] Unless otherwise stated, this section is taken from Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Defs.' Opp'n").

entitled to use and profit from the plaintiffs' copyrighted works.

For the reasons discussed below, we conclude that ivi is not a cable system under Section 111, and thus do not reach the question of whether they are governed by the Communications Act.

**PRIOR HISTORY**

Plaintiffs filed their complaint seeking damages and injunctive relief on September 28, 2010. Plaintiffs' complaint notified the Court of a declaratory action brought by ivi days earlier in the Western District of Washington.[4] Plaintiffs thereafter informed the Court that they had filed a motion to dismiss the Washington action as an "improper anticipatory filing" which was not entitled to the traditional application of the first-filed rule under Ninth Circuit law. See Topics Entertainment, Inc. v. Rosetta Stone Ltd., Case No. C09-1408RSL, 2010 U.S. Dist. LEXIS 205 (W.D. Wash. Jan. 4, 2010) (collecting cases for the proposition that the Declaratory Judgment Act should not be invoked to deprive a plaintiff of its chosen forum and dismissing a first-filed declaratory action which was initiated after "specific, concrete indications that a suit by the defendant is imminent," including a cease and desist letter). This Court held a phone conference on October 7, 2010,

---

[4] Every defendant in the declaratory action in Washington is a plaintiff in this case. However, there are additional plaintiffs before this Court who were not parties to the Washington action.

during which it informed the parties that while it intended to comply with the well-settled rule in this District that the court before which a first-filed action was brought determines which forum will hear the case, MSK Ins., Ltd. v. Employers Reinsurance Corp., 212 F. Supp. 2d 266, 267 (S.D.N.Y. 2002) (Buchwald, J.) (collecting cases), nonetheless the parties could proceed to brief any motions they wished so that there would be little delay if the Western District of Washington dismissed the case.[5]

In fact, this result eventuated. On January 19, 2011, the Western District of Washington dismissed ivi's declaratory action as an impermissible anticipatory filing. ivi, Inc. v. Fisher Comms., Inc., Case No. C10-1512JLR, 2011 U.S. Dist. LEXIS 4925 (W.D. Wash. Jan. 19, 2011). The question of forum having been resolved, this Court undertook to schedule oral argument on plaintiffs' motion for a preliminary injunction. Oral argument was held on February 2.[6] At oral argument, we noted that given the lengthy delay between briefing and further action in this

---

[5] Three motions were made and fully briefed: (1) plaintiffs' motion for preliminary injunctive relief; (2) defendants' motion to transfer venue; and (3) defendants' motion to dismiss the claims against Weaver for lack of personal jurisdiction.

[6] On February 1, we granted leave to a group of public interest organizations to file an amici brief in support of defendants. The organizations, Public Knowledge, Electronic Frontier Foundation, Media Access Project, and Open Technology Initiative (a project of the New America Foundation), are dedicated to "maintaining an open, competitive, and diverse communications infrastructure." See Amicus Memorandum of Law in Opposition to Motion at 3.

case, it would be more efficient to address the issues in an opinion on the motion for a preliminary injunction.[7]

## DISCUSSION

### A. Preliminary Injunction Standard

The standard for the issuance of a preliminary injunction in a copyright case has recently been reviewed in Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010). A preliminary injunction is appropriate when: (1) the plaintiff demonstrates either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the plaintiff's favor; (2) the plaintiff demonstrates that he is likely to suffer irreparable injury in the absence of an injunction; (3) the balance of hardships between the plaintiff and defendant tips in the plaintiff's favor; and (4) the "public interest would not be disserved by the issuance of a preliminary injunction." Id. at 79-80 (citing eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006)). As a

---

[7] At oral argument, the defendants' motions were resolved. This Court denied the transfer motion, which was almost entirely premised on the first-filed rule and the existence of the case in Washington, noting that with the dismissal of the Washington action the § 1404 considerations now weighed heavily in favor of the plaintiffs. See Transcript at 2. As for the motion to dismiss for lack of personal jurisdiction, this Court viewed defendants' argument as essentially stating that plaintiffs had not adequately pled personal jurisdiction over Weaver. Thus, the Court denied the motion and granted plaintiffs leave to replead and more specifically allege personal jurisdiction. See Transcript at 2. The Court noted that this issue seemed largely academic at this stage, as there was little question that Weaver would be subject to discovery in this District in any event.

result of <u>Salinger</u>, a preliminary injunction is no longer presumed to be the appropriate remedy in a copyright action upon a demonstration that there is a likelihood of success on the merits. <u>Id.</u> at 74-79. Rather than relying on a presumption of irreparable harm, as was the practice prior to <u>eBay</u> and <u>Salinger</u>, plaintiffs must show that "on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." <u>Id.</u> at 82.

B.   <u>Likelihood of Success on the Merits</u>

1.   <u>Legal Standards</u>

In a motion for a preliminary injunction, the burden lies with the moving party to demonstrate the four requirements indentified above. <u>See Salinger</u>, 607 F.3d at 79-80. However, in determining whether plaintiffs here have met their burden of demonstrating a likelihood of success on the merits, we are cognizant of the fact that plaintiffs have demonstrated a prima facie case of copyright infringement, since it is undisputed that they own valid copyrights and that ivi is making public performances of their works without their consent. <u>See</u>, <u>e.g.</u>, <u>Warner Bros. Entm't Inc. v. RDR Books</u>, 575 F. Supp. 2d 513, 533 (S.D.N.Y. 2008). Thus, defendants are liable for copyright infringement under 17 U.S.C. § 106(4) unless they meet a statutory exception. The burden of proof rests with defendants to demonstrate that they have a statutory defense. <u>Cf.</u> <u>Infinity</u>

Broadcasting Corp. v. Kirkwood, 965 F.Supp. 553, 555 (S.D.N.Y. 1997) (referring to "fair use" and "carrier defenses," the latter being another exception found in Section 111), rev'd on other grounds, 150 F.3d 104 (2d Cir. 1998); National Football League v. Insight Comms. Corp., 158 F.Supp.2d 124, 126 (D. Mass. 2001) (referring to the carrier exception of Section 111 as an "affirmative defense").[8]

  2. Analysis

A review of the historic context, statutory text, and administrative record compels a finding that ivi is not a cable system under Section 111. Absent defendants' skewed interpretation of the statutory text and administrative record, there is absolutely no basis for holding otherwise.

In the thirty-five years since the passage of Section 111, many companies have constructed business models revolving around the use of new technologies and the statutory license. Some new technologies have been found to fall within Section 111. Others have motivated Congress to devise separate licensing schemes to address the unique issues they present. No technology, however,

---

[8] The Second Circuit's warning that courts should be "particularly cognizant of the difficulty of predicting the merits of a copyright claim at a preliminary injunction hearing," given the often "sophisticated and fact-intensive" nature of common copyright law disputes such as whether one work is "substantially similar" to or a "fair use" of another is not implicated in this case. Salinger, 607 F.3d at 80-81 (citing Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in Intellectual Property Cases, 48 Duke L. J. 147, 201-202 (1998)).

has been allowed to take advantage of Section 111 to retransmit copyrighted programming to a national audience while not complying with the rules and regulations of the FCC and without consent of the copyright holder.

### a. Congressional Intent and Purpose[9]

Cable television initially developed as a means of facilitating reception of television stations by households who were unable to receive satisfactory over-the-air signals because of their geographic location. In other words, cable operators provided technology that brought television signals to households which otherwise could not receive broadcast reception. In fact, up until the 1970s, cable television simply retransmitted broadcast signals, rather than offering the lineup of original channels and programming that is typical of cable television today.

In 1968 and 1974, two Supreme Court decisions held that cable systems were not "performing" broadcast programming when retransmitting its signals, and as a result were not infringing any copyrights under the Copyright Act of 1909, the then governing statute. Teleprompter Corp. v. Columbia Broad. Sys.,

---

[9] Unless noted otherwise, this background history is taken from Register of Copyrights, Satellite Home Viewer Extension and Reauthorization Act Section 109 Report (2008) ("SHVERA Report"), submitted to the Court as exhibit 11 to Declaration of Christopher Scott Morrow in Support of Motion for Preliminary Injunction. Citations to the SHVERA Report in this section will only follow direct quotations.

Inc., 415 U.S. 394 (1974) (retransmission of distant television station signals); Fortnightly Corp. v. United Artists Television, 392 U.S. 390 (1968) (retransmission of local television station signals). As a result, cable systems had essentially received authorization to retransmit broadcast television programming without incurring any costs to the copyright owners.

Congress resolved to correct this perceived injustice by statute. Recognizing that cable systems were providing a societal benefit by facilitating greater access to broadcast television, Congress sought to create a system balancing copyright owners' entitlement to compensation for the use of their works with the promotion of cable systems. Simply making cable retransmissions a violation of the Copyright Act could have practically destroyed the cable business, since "cable operators typically carried multiple broadcast signals containing programming owned by dozens of copyright owners" and it was "not realistic for hundreds of relatively small cable operators to negotiate individual licenses with dozens of copyright owners." SHVERA Report at 3. Congress recognized the limitations of the free market and, believing that it would be unable to function on its own, resolved to create a public market.

The result of Congress' determination to compensate copyright owners while ensuring broad access to television was Section 111. Cable systems would be able to carry distant broadcast signals by means of a statutory license which would compensate copyright owners for the public performance of their works. Thus, copyright owners would be compensated without the prohibitive transaction costs to the cable systems of the private market. See Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., 836 F.2d 599, 602-03 (D.C. Cir. 1988) (citing House Report from 1976 and noting that "Congress was of the view that the Copyright holders should receive direct compensation for the use of their rights," "but Congress also recognized that the transaction costs accompanying the usual scheme of private negotiation that controls the use of copyrighted materials could be prohibitively high" and saw that "neither the situation as it existed after Fortnightly and Teleprompter nor a replication of classic copyright arrangements would be entirely satisfactory").

Congress, however, did not legislate on a blank slate. The statutory license did not constitute the only regulation of cable systems. Congress was well aware of the significant role that the Communications Act and the rules of the FCC played in regulating the cable industry, and anticipated that the compulsory licensing system and the Communications Act would complement each other. Furthermore, Congress understood that the

FCC regulated the cable industry as a "highly localized medium of limited availability." 67 Fed. Reg. 18705, 18707 (Apr. 17, 1997). The interaction between these regulatory schemes will be addressed more fully below.

Indeed, it is impossible to evaluate the outer boundaries of Section 111 without considering this historical context. It is "axiomatic...that in fulfilling our responsibility in interpreting legislation, we are not guided by a single sentence or member of the sentence but (rather) look to the provisions of the law, and to its object and policy." Langhorne v. Ashcroft, 377 F.3d 175, 180 (2d Cir. 2004) (parentheses in original) (quoting Richards v. United States, 369 U.S. 1, 11 (1962)). The need to analyze congressional objectives and policy is particularly important when evaluating the limited exceptions to the public performance right found in Section 111. As Judge Kaplan noted in a case involving the passive carrier exception of Section 111(a)(3), and quoting the Second Circuit, we are "obliged to take into account" the "common sense" of the statute and "practical considerations of the suggested interpretations." Infinity Broadcasting Corp. v. Kirkwood, 63 F. Supp. 2d 420, 426 (S.D.N.Y. 1999) (quoting Eastern Microwave, Inc. v. Doubleday Sports, Inc., 691 F.2d 125, 127 (2d Cir. 1982)). In that case, Judge Kaplan declined to allow a businessman engaged in the retransmission of copyrighted materials to seek refuge under the

carrier exception, noting that to hold otherwise would "threaten considerable mischief" in a world undergoing an "era of rapid technological change" and "would do violence to a fundamental premise of the 1976 revision" to the copyright law." Id.

Furthermore, we are mindful of the fact that in creating Section 111, Congress made an exception to the Copyright Act's exclusive right to public performance. In doing so, it took a right that is fundamentally exclusive and private and propelled it into the public market. Compulsory licenses are a "limited exception to the copyright holder's exclusive right to decide who shall make use of his [work]," and courts must not "expand the scope of the compulsory license provision beyond what Congress intended...nor interpret it in such a way as to frustrate that purpose." Fame Publishing Co. v. Alabama Custom Tape, Inc., 507 F.2d 667, 670 (5th Cir. 1975).[10] In the words of the Copyright Office:

> "As the owners of exclusive rights in a work, copyright holders possess a property grant which entitles them to negotiate and bargain for use of the work. This property right is limited only in well

---

[10] Defendants argue that we should not rely on this case, as it did not construe Section 111 and was decided before its enactment. We fail to see any reason why its rationale would not apply with equal force to the compulsory license created by Section 111. Compulsory licenses are exceptions to the copyright laws, and they must not be expanded beyond Congress' intent. Indeed, when a statute "sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the [provision].'" Tasini v. New York Times Co, 206 F.3d 161, 168 (brackets in original) (quoting Commissioner v. Clark, 489 U.S. 726, 739 (1989)), aff'd on other grounds 533 U.S. 483 (2001).

> articulated exceptions appearing in the statute. The
> cable compulsory license is one of those exceptions,
> and the Copyright Office will not dilute the property
> right of copyright holders beyond what is expressed in
> the statutory exception."

57 Fed. Reg. 3284 (Jan. 29, 1992).

Given these guiding principles, the specific aim of the compulsory license for cable systems, and Congress' reliance on the Communications Act and understanding of the cable industry as a highly localized medium, we cannot conclude that Congress intended to sanction the use of a compulsory license by a company so vastly different from those to which the license originally applied. ivi's architecture bears no resemblance to the cable systems of the 1970s. Its service retransmits broadcast signals nationwide, rather than to specific local areas. Finally, unlike cable systems of the 1970s, ivi refuses to comply with the rules and regulations of the FCC. As the Second Circuit has noted, we must consider the practical impact of our decisions construing Section 111 in a technological world unimaginable to Congress in 1976. An opposite finding in this case would surely "threaten considerable mischief." See Infinity Broadcasting Corp., 63 F. Supp. 2d at 426.

We do not reach this conclusion solely on our view of congressional intent. We also rely heavily on the thoroughly reasoned and extremely persuasive statements of the Copyright Office, as well as significant clues from the statutory text.

We now turn to a discussion of the Copyright Office's interpretations of Section 111.

### 2. Copyright Office Interpretations

The Copyright Office is the administrative agency charged with overseeing the compulsory license scheme of Section 111. See Cablevision Sys. Dev. Co, 836 F.2d at 608 (D.C. Cir. 1988) (noting that the Copyright Office has the authority to issue binding interpretations of the Copyright Act and is entitled to deference when appropriate). It is the unwavering opinion of the Copyright Office that a distributor of broadcast programming over the Internet does not qualify for a compulsory license as a cable system under Section 111.

As early as 1991, the Copyright Office issued statements and engaged in regulatory activity which strongly undercut defendants' arguments before this Court. By 1999, the Copyright Office explicitly rejected the claim that Internet retransmission services could qualify for a Section 111 license.

Defendants' argue that the Copyright Office's most recent statements support their position and that there is "no contrary Copyright Office ruling entitled to deference." Defs.' Opp'n at 8-11. Both contentions are mistaken. As detailed below, the Copyright Office's most recent statements unambiguously reject the claim that a service such as ivi's could be a cable system, and essentially view the matter as settled law. Furthermore, the

interpretations of the Copyright Office are entitled to a great deal of so-called Skidmore deference. See Skidmore v. Swift & Co., 323 U.S. 134 (1944).[11] As the Supreme Court has held, even where agency interpretations are not entitled to deference under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467

---

[11] Despite their own reliance on Copyright Office statements, defendants argue that we should not grant any deference to the Copyright Office's views because the definition of Section 111 is clear, and "if Congress has directly spoken to the precise question at issue, or if the intent of Congress is clear, it must be given effect and the administrative agency cannot interfere with that intent." Defs.' Opp'n at 10 (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)). In addition, they claim that the Copyright Office's "various reports to Congress" and "informal statements" are not "interpretations of the sort entitled to deference" because they are not a "Copyright Office Rule that is adopted after a Notice of Proposed Rulemaking and an appropriate period for submission and evaluation of public comments." Defs.' Opp'n at 10-11. Both assertions are erroneous.

First, the contention that Congress has provided a clear command on the question before us, and that this command confirms defendants' view, cannot be taken seriously. The statute in question was passed in 1976 in an effort to strike a balance between providing cable access to broadcast television and compensation for copyright owners. It is unrealistic to say that Congress intended to answer the precise question of whether Internet retransmissions of network broadcasts could qualify for a compulsory license, and it is even less supportable to say that Congress indisputably answered that question in the affirmative.

Furthermore, defendants distort the history of administrative activity. The Copyright Office has not only produced reports and "informal statements to Congress," but has engaged in formal rulemaking as well. While these regulations do not specifically address the issue before this Court, and some have been mooted by later developments, it is simply incorrect to imply that the Copyright Office has not given serious thought to how the compulsory license of Section 111 interacts with emerging technologies.

Finally, defendants' position misstates applicable law. While Chevron deference is reserved for those situations in which "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," Skidmore deference is still available. United States v. Mead Corp., 533 U.S. 218, 226-27 (2001).

U.S. 897 (1983), they still might "influence courts facing questions that the agencies have already answered." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). The "fair measure of deference to an agency administering its own statute has been understood to vary with the circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Id. at 227. In other words, as the Court wrote in Skidmore: "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140.

The interpretations of the Copyright Office merit substantial weight when the Skidmore factors are applied. The Office has demonstrated extreme diligence and thoughtfulness in gathering comments, doing research, addressing all relevant considerations, and explaining its decisions. It has a great deal of relative expertise in this technical and esoteric area of law, and it has been remarkably consistent. Most significantly, its reasoning is valid and persuasive. In sum, we find the Copyright Office's analysis in determining that

Congress never intended Section 111 to apply to a service such as ivi to be powerfully convincing.

The record that follows will demonstrate how thoroughly the Copyright Office has engaged with these issues. It will also incontrovertibly reflect three findings of the Copyright Office. First, a service providing Internet retransmissions cannot qualify as a cable system. Second, the compulsory license for cable systems is intended for localized retransmission services, and cannot be utilized by a service which retransmits broadcast signals nationwide. Third, the rules and regulations of the FCC, even if found not to be binding on a service such as ivi, are integral to the statutory licensing scheme established in 1976.

   a. <u>Copyright   Office   Regulations   of   Non-Internet       Technologies</u>

Our review of the Copyright Office's regulatory activity begins with the rulemaking process it initiated in 1986 to determine the applicability of Section 111 to satellite master antenna television[12] ("SMATV") and multichannel multipoint distribution services[13] ("MMDS"). In 1986, the Copyright Office issued a notice of inquiry in which it notified the public that

---

[12] SMATV systems use "TVROs [television receive-only satellite dish] to receive transmissions via satellite, and a master antenna for receipt of over the air television signals. The programming is then combined and distributed by cable to subscribers, primarily in apartment houses and other multi-unit residential buildings." 62 Fed. Reg. 18705, 18706 (Apr. 17, 1997).

[13] MMDS is essentially wireless cable; instead of laying cables and wires, microwave frequencies bring cable television to the viewer.

it was considering amendments to its regulations implementing portions of Section 111, detailed the applicable law and relevant considerations, and sought public comments on the "advisability of clarifying the definition of 'cable system'... in light of changes in communications law and regulations, and new methods of distributing copyrighted television programming" such as SMATV and MMDS. 51 Fed. Reg. 36705 (Oct. 15, 1986). In 1988, after the close of the comment period but before the Copyright Office had taken any further regulatory action, it re-opened the comment period for SMATV and MMDS and expanded the scope of its inquiry to include satellite carriers. 53 Fed. Reg. 17962 (May 19, 1988).

While the Copyright Office was engaged in this rulemaking process, Congress created a separate license for satellite carriers, found at 17 U.S.C. § 119 ("Section 119"). However, given the temporary nature of that statute,[14] and ongoing litigation between a broadcast network and a satellite carrier to which Section 119 did not apply,[15] the Copyright Office continued the process of determining the applicability of the

---

[14] This license was originally set to expire in 1994. It has been consistently reauthorized.

[15] See Nat'l Broad. Co. v. Satellite Broad. Networks, 940 F.2d 1467 (11th Cir. 1991). In passing Section 119, Congress explicitly stated that it should not apply to this case. Id. at 1470 n.2 (citing H.R. No. 100-887(I), 100th Cong., 2d Sess. 14, reprinted in 1988 U.S. Code Cong. & Admin. News 5611, 5617, 5630).

cable system license of Section 111 to satellites. While the rulemaking involving SMATV, MMDS, and satellite technology did not deal specifically with the Internet, the agency's approach to Section 111 is enlightening.

In 1991, the Copyright Office issued a notice of proposed rulemaking in which it proposed new regulations governing the conditions under which SMATV systems could qualify as a cable system for Section 111, announced a policy decision that satellite carriers are not eligible for the license in Section 111, and declared a preliminary policy decision that MMDS services are also not eligible. In 1992, the Copyright Office affirmed its position that satellite carriers were not cable systems within the meaning of Section 111 in a final rulemaking. 57 Fed. Reg. 3284 (Jan. 29, 1992) (codified at 37 C.F.R. § 201.17(l)). This determination came on the heels of the Eleventh Circuit's decision in National Broadcasting Company, Inc. v. Satellite Broadcast Networks, Inc., 940 F.2d 1467 (11th Cir. 1991), which had overturned a district court and found that satellites did fit within the Section 111 definition of a cable system.[16] In the commentary accompanying the rule, the Copyright

---

[16] In 1994, the Eleventh Circuit revisited the issue and upheld the Copyright Office regulation, noting that the Office had "roundly criticized our decision" in the 1991 case. Satellite Broadcasting & Comms. Assn. of America v. Oman, 17 F.3d 344 (11th Cir. 1994). Undeterred, defendants in this action rely heavily on the 1991 decision. Inasmuch as they rely on the case for the proposition that Section 111 was not meant to be construed strictly to apply to then-existing technologies and could encompass new technologies not

Office was unrelenting in its criticism of the Eleventh Circuit's decision, noting that the compulsory license provision should be "construed according to its terms, and should not be given a wide scale interpretation which could, or will, encompass any and all new forms of retransmission technology." 57 Fed. Reg. 3284 (Jan. 29, 1982).

Engaging in a thorough, point-by-point refutation of the Eleventh Circuit's decision, the Copyright Office noted several points that are particularly relevant to the factual context currently before us.[17]

The Copyright Office first criticized the Eleventh Circuit for its failure to address the fact that Section 111 is "clearly directed at localized transmission services." 57 Fed. Reg. 3284

---

available in 1976, we certainly agree. However, we cannot accept defendants' stubborn insistence that in "addition to the *NBC* decision from the Eleventh Circuit, both the Eight [sic] Circuit and the Second Circuit have previously held that transmission by 'wires, cables or other communications channels' is broad enough to include satellite broadcasts" and that "[s]urely if a satellite company can be a cable system under Section 111 then transmission over the wires or other communications channels of the Internet must also fit." Defs.' Opp'n at 8. The notion that satellites could fit within the Section 111 definition of a cable system was vigorously rejected by the Copyright Office, whose opinion was then affirmed by the same Eleventh Circuit that had reached the opposite conclusion a few years earlier. In a similar vein, Congress has consistently reenacted the Section 119 license for satellites. Today, it is well-settled that satellites must use the license found in Section 119 rather than Section 111.

[17] We fully recognize distinctions between satellites and the Internet, and specifically that satellites are not located in any state, a clear definitional requirement of Section 111. However, while the Copyright Office took note of the "any state" issue, it by no means relied exclusively on this fact. Thus, while the satellite context is not on all fours with ivi, there is no question that a large part of the Office's rationale is pertinent here.

(Jan. 29, 1992). The Office concluded that "[e]xamination of the overall operation of section 111 proves that the compulsory license applies only to localized retransmission services regulated as cable systems by the FCC." The Office focused on the second part of the definition in Section 111(f), which refers to "headends" and "contiguous communities." These two concepts "do not have any application to a nationwide retransmission service such as satellite carriers." Id. It also noted that Section 111(f) defines "'distant signal equivalent' with reference to television stations 'within whose local service area the cable system is located.'" The Office conceded that satellite carriers might have subscribers "located in the service area of a primary transmitter" but asserted that they "cannot argue that their 'cable system' is located in that same area as required by the definition." Id.

The Copyright Office also posited that the operation of Section 111 was "hinged on the FCC rules regulating the cable industry." Id. Since satellite carriers were not regulated by the FCC, Congress did not intend for them to be covered. The Office noted that when Congress passed the Copyright Act, its "understanding of the regulation of the cable industry was naturally based on FCC policy and precedent." Id. Thus, the Office asserted that it was "reasonable to conclude that the copyright compulsory license was adopted to apply to those same

types of services then regulated by the FCC as cable systems."
<u>Id.</u>

The 1992 final rulemaking also affirmed the Copyright Office's preliminary policy position pertaining to MMDS[18] technology, relying on similar grounds. The Copyright Office found that MMDS technology could not be covered by the statute, largely because Congress only intended the license to encompass entities governed as cable systems by the FCC. It noted that a "broad reading of the phrase 'other communications channels' in section 111(f) to include systems, such as...MMDS, which are not regulated by the FCC as cable systems would be contrary to the express congressional purpose of adopting a compulsory license for the cable industry."[19] The Office asserted that the legislative history and statutory text made clear that Congress intended the compulsory license and FCC regulations to go hand-in-hand, i.e., that these entities seeking to use the compulsory license would be regulated by the FCC.[20]

---

[18] It will be recalled that MMDS may be described as wireless cable.

[19] In 1994, Congress amended Section 111 to include "microwave" as one of the acceptable communications channels for retransmissions. <u>See</u> 17 U.S.C. § 111(f)(3).

[20] The Copyright Office noted that its own regulations provided that entities "not regulated as 'cable systems' by the FCC may nevertheless satisfy the Copyright Act's definition and qualify for the compulsory license." 57 Fed. Reg. 3284 n.9 (Jan. 29, 1992). It noted further, however, that this regulation only applied to wired systems which qualify under the Copyright Act as a cable system but were not regulated by the FCC as one "because of the number or nature of its subscribers or the nature of its secondary

In 1997, the Copyright Office concluded the rulemaking process for SMATV, which involves the use of cables for distribution to suppliers, finalizing its conclusion that it could qualify as a cable system under Section 111.[21] Significantly for our purposes, the Copyright Office reaffirmed much of its rationale from the 1992 final rulemaking for satellites and MMDS. In rejecting the notion that the Copyright Office should not consider whether a video provider constitutes a "local medium of limited availability" and only look at the "section 111 definition of a cable system," it noted:

> "[A]s the Office has stated previously, section 111 must be construed in accordance with Congressional intent and as a whole, not just in reference to one particular section. 57 FR 3292 (Jan. 29, 1992). The Office notes that at the time Congress created the cable compulsory license, the FCC regulated the cable industry as a highly localized medium of limited availability, suggesting that Congress, cognizant of the FCC's regulations and the market realities, fashioned a compulsory license with a local rather than a national scope. This being so, the Office *retains the position that a provider of broadcast signals be an inherently localized transmission media*

---

transmissions." Id. (quoting 37 C.F.R. 201.17(b)(2)). The Office asserted that its regulation does not affirmatively allow industries which have been entirely excluded from the FCC regulatory scheme, such as wireless systems, to qualify as a cable system. Rather, a technology could be a cable system so long as it was "recognized as such under the rules of the FCC even if the FCC elects not to subject the system to certain rules applied to other wired cable systems." Id.

[21] The 1992 final rulemaking pertaining to MMDS and satellite technology specifically noted that it was not addressing SMATV, which would be "addressed separately at a later date." 57 Fed. Reg. 3284 (Jan. 29, 1992).

> *of limited availability to qualify as a cable system.*
> 56 FR 31595 (July 11, 1991).[22]

62 Fed. Reg. 18705, 18706 (Apr. 17, 1997).

We conclude our review of the Copyright Office's application of Section 111 to new, non-Internet technologies by noting a prescient statement from the 1992 final rulemaking on satellites and MMDS. In rejecting arguments that it should use public policy considerations to determine that MMDS technology could qualify for the compulsory license,[23] the Office noted:

> "Many of the arguments now made by MMDS would be made by direct broadcasting services, by satellite carriers, by the telephone companies, *and future unknown services*. Since the 1976 Act did not consider the public policy implications of extending a

---

[22] Applying these principles, the Copyright Office found that SMATV systems qualified as cable systems if they were "facilities which receive television signals from satellites and retransmit them [by cables] to subscribers residing in multiple unit dwellings, such as apartment complexes and hotels." 62 Fed. Reg. 18705, 18707 (Apr. 17, 1997). The Copyright Office arrived at this conclusion after consulting the FCC's regulatory policy for cable systems. The Office noted that the FCC did not consider SMATV to be a cable system, and that while "the history of communications regulation of SMATV systems is relevant to determining what is a SMATV system, we acknowledge that it is not dispositive for the copyright inquiry." It then determined that the FCC's requirement that a cable system use a "public right-of-way" had no applicability to Section 111. Thus, while it is clear that there are situations in which an entity could be a cable system for purposes of Section 111 while remaining unregulated by the FCC, there can be no dispute that the FCC's rules and regulations are integral to the determination of whether a technology could qualify as a cable system.

[23] The Copyright Office made clear that it based its conclusions entirely on the statutory text and legislative history, and not policy concerns. It noted that "general public policy issues are for Congress to resolve, and the question of whether it is sound policy to create a compulsory license for MMDS operations is for future legislation." 57 Fed. Reg. 3284 n.5 (Jan. 29, 1992). Ultimately Congress acted, passing the amendment in 1994 that added "microwaves" to the definition types of communications channels which could be used to qualify as a cable system.

compulsory license to these non-cable services, the Copyright Office should not assert the authority to interpret the Copyright Act in this way."

57 Fed. Reg. 3284 n.5 (Jan. 29, 1992) (emphasis added).

### b. Copyright Office Statements on Internet Retransmission Services

To our knowledge, the Copyright Office's first statement pertaining to whether Internet retransmissions could qualify as a cable system may be found in a 1997 report to Congress reviewing the statutory scheme governing the retransmission of broadcast signals. In this August 1997 report, issued pursuant to a request of the Chairman of the Senate Judiciary Committee, the Office determined that it was inappropriate to bestow the benefits of a compulsory license on an industry "so vastly different from the other retransmission industries now eligible for compulsory licensing." Copyright Office, A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals 97 (1997). Although concluding that it was premature to fully address the issue, nonetheless the Copyright Office noted that the significant difference between Internet retransmissions and other licensees, including satellite carriers, was the ability for the Internet to retransmit programming "instantaneously worldwide." Id.

In 2000, the Register of Copyrights was invited to testify before the House Subcommittee on Courts and Intellectual

Property on the topic of "copyrighted broadcast programming on the Internet." During her testimony, the Register first addressed Congress' reauthorization in 1999 of the compulsory license for satellite carriers found in Section 119. According to the Register, the subject of Internet retransmissions was not addressed during each chambers' internal debate on the reauthorization. However, toward the end of the House and Senate conference an amendment was proposed that would "clarify that the section 111 cable compulsory license did not apply to broadcast retransmissions via the Internet." Copyrighted Broadcast Programming on the Internet: Hearings Before the Subcomm. on Courts and Intellectual Prop. of the House Comm. on the Judiciary, 106th Cong. (2000) (statement of Marybeth Peters, Register of Copyrights) ("Peters Statement"). Several Internet companies objected, since they thought they might ultimately desire to use the cable compulsory license for Internet retransmissions, much as ivi is attempting to do now.

At her testimony in 2000, the Register of Copyrights stated that at the time of the debate the Office thought the amendment was of "little consequence, since we believed that the cable compulsory license could not reasonably be interpreted to include Internet retransmissions." She also noted that as the debate surrounding the amendment grew, she wrote a letter to the Chairman and Ranking Member of the House Subcommittee on Courts

and Intellectual Property which expressed her belief that the proposed amendment was "indeed a clarification, and not a change of existing law." <u>Id.</u> The letter stated:

> "It is my understanding that some services that wish to retransmit television programming over the Internet have asserted that they are entitled to do so pursuant to the compulsory license of section 111 of Title 17. I find this assertion to be without merit. The section 111 license, created 23 years ago in the Copyright Act of 1976, was tailored to a heavily-regulated industry subject to requirements such as must-carry, programming exclusivity, and signal quota rules -- issues that have also arisen in the context of the satellite compulsory license. Congress has properly concluded that the Internet should be largely free of regulation, but the lack of such regulation makes the Internet a poor candidate for a compulsory license that depends so heavily on such restrictions. I believe that the section 111 license does not and should not apply to Internet retransmissions."

<u>Letter of Marybeth Peters, Register of Copyrights, to the Honorable Howard Coble</u> (Nov. 10, 1999).

Ultimately, because of what the Register would describe in 2000 as an "inability to resolve the issue in the remaining days of the last session of Congress, the amendment was removed before the legislation was enacted." Peters Statement.

The Register's 2000 testimony then addressed the Copyright Office's present position on Internet retransmissions. She stated in no uncertain terms that the Copyright Office maintained the position it took during the 1999 debate. She noted that the Office's "view on this matter has not changed: if there is to be a compulsory license covering such

retransmissions, it will have to come from newly enacted legislation and not existing law." Id.

The Register further informed Congress that the Copyright Office thought that no such legislation should be enacted. The Office's principal concern was the perceived lack of ability to control the geographic scope of Internet retransmissions. Not only did this raise the possibility of piracy, but it also would place the United States dangerously close to violating its obligations under international treaties governing intellectual property rights, such as the Berne Convention. Id.

### c. June 2008 SHVERA Report

A report required by the 2004 extension and reauthorization of the satellite license provided another opportunity for the Copyright Office to set forth its views on the statutory licenses and its application to new technologies. Congress ordered the Copyright Office to provide a report on the Office's "findings and recommendations on the operation and revision of the statutory licenses under sections 111, 119, and 122 of title 17, United States Code." Satellite Home Viewer Extension and Reauthorization Act, Pub. L. No. 108-447, §109, 118 Stat. 3393, 3407-08 (2004). This report, entitled the "Satellite Home Viewer Extension and Reauthorization Act Section 109 Report" ("SHVERA Report"), was to be submitted no later than June 30, 2008.

Both parties rely on this report in pressing their arguments to this Court. Defendants argue that the Report represents a "retreat" by the Office from its earlier statements concluding that Internet retransmissions could not qualify for a Section 111 license. Defendants are able to make such a claim only by cherry-picking quotations and ignoring the repeated and unambiguous assertions that Internet retransmission such as ivi's cannot qualify for a compulsory license under Section 111.

A review of the SHVERA Report makes clear that not only has the Copyright Office's position on the applicability of the compulsory license to Internet retransmissions remained consistent, but also that it essentially views the question as settled. Furthermore, while the SHVERA Report does not state that only entities *regulated* by the FCC could qualify as cable systems under Section 111, it provides no support for the notion that entities who *refuse to comply* with the rules and regulations of the FCC can obtain a statutory license.

### 1. Notice of Inquiry

In order to prepare the SHVERA Report, on April 16, 2007 the Copyright Office released a Notice of Inquiry in which it sought public comments on issues relating to the "operation of, and continued necessity for, the cable and satellite statutory licenses." 72 Fed Reg. 19,039 (Apr. 16, 2007). In a section of this Notice entitled "*expansion*," the Office noted that it was

"obligated to provide Congress with recommendations based on current circumstances," and thus was seeking "comment on whether the current statutory licensing schemes should be expanded to include the delivery of broadcast programming over the Internet or through any video delivery system that uses Internet Protocol."[24] Id. at 19053 (emphasis in original). It also asked whether, in the alternative, "licensing of discrete broadcast programming should be allowed to develop in the marketplace." Id. The Office continued that "it is important to note here, that unlike cable systems and satellite carriers, Internet video providers do not own any transmission facilities; rather, they host and distribute video programming through software, servers, and computers connected to the Internet." Id.

It is clear that at the time of the Notice of Inquiry the Copyright Office had not altered its view of Internet retransmissions. However, it sought comments on Internet Protocol television, Internet retransmissions, the potential

---

[24] Using "Internet Protocol" to deliver video programming (commonly referred to as "IPTV") is distinct from using the Internet. To adopt plaintiffs' description, the Internet is a "global system of millions of interconnected...computer networks, to which content providers and end-users connect using their own respective Internet Service Providers." Plaintiffs' Memorandum of Law in Reply ("Pls.' Reply") at 3. In contrast, IPTV is a "term for a transmission protocol or format in which video is delivered in digital 'packets' that include an IP address header." IPTV video is "typically delivered through a closed, 'end-to-end' system" in which the distributor controls the wires and routers right up until the subscriber's home. Pls.' Reply at 3. We address the distinction between services such as ivi and Internet Protocol providers infra at n. 28.

usefulness of a statutory license in the Internet setting, and whether there was any evidence of marketplace failure necessitating such a license.

## 2. "New Distribution Technologies"

The final SHVERA Report contained one chapter dedicated to a discussion of new distribution technologies, including the Internet. ivi would fit into this chapter. The chapter opens with the Report's "principal" finding:

> "[N]ew systems that are *substantially similar* to those systems that already use Section 111, should be subject to the license. Thus, *systems that use Internet protocol to deliver video programming, but are the same in every other respect to traditional cable operators*, should be eligible to use Section 111 to retransmit broadcast signals, provided that these systems abide the same broadcast signal carriage statutory provisions and FCC exclusivity requirements applicable to cable operators."

SHVERA Report at 181 (emphasis added).

Not only did the Copyright Office conclude that Internet retransmissions were not substantially similar to pre-existing technologies and thus could not qualify as cable systems under current law, but the Office strongly recommended against new legislation expanding the licensing scheme to include Internet retransmissions.[25] The Office stated:

---

[25] The Copyright Office's rationale for its conclusion that there should not be a new compulsory license for Internet retransmissions is helpful to our understanding of Congress' intent in 1976. In addition, the fact that the Copyright Office views the issue of Internet retransmissions as settled in the negative, and only addresses the question of expansion, is obviously noteworthy.

35

"The Office continues to oppose an Internet
statutory license that would permit any website on the
Internet to retransmit television programming without
the consent of the copyright owner. Such a measure, if
enacted, would effectively wrest control away from
program producers who make significant investments in
content and who power the creative engine in the U.S.
economy. In addition, a government-mandated Internet
license would likely undercut private negotiations
leaving content owners with relatively little
bargaining power in the distribution of broadcast
programming. Further, there is no proof that the
Internet video market is failing to thrive and is in
need of government assistance through a licensing
system. In fact, the lack of a statutory license
provides an incentive for parties to find new ways to
bring broadcast programming to the marketplace and
that market, by all accounts, continues to grow.
Finally, there is technology currently available, such
as Slingbox, that uses the Internet to make existing
licensed programming available to individuals for
personal use in a controlled fashion and without the
need for an additional license. Thus, the demonstrated
ability and willingness to use the Internet to bring
programming to consumers obviates the need for a
government-sanctioned statutory license.

To be clear, *the Office is not against new
distribution models that use Internet protocol to
deliver programming, but only opposes the circumstance
where any online content aggregator would have the
ability to use a statutory license to sidestep private
agreements and* [sic] *free from any of the limitations
imposed on cable operators and satellite carriers by
the Communications Act and the FCC's rules.*

SHVERA Report at 188 (emphasis added).

The Office also noted its concern that an "expansion" of
the statutory license to the Internet could potentially place
the United States in violation of international treaties. SHVERA
Report at 188; see, e.g., AUSTRALIA FTA, U.S.-Austl., Article
17.4.10(b) ("...neither Party may permit the retransmission of

television signals (whether terrestrial, cable, or satellite) on the Internet without the authorisation of the right holder or right holders, if any, of the content of the signal and of the signal....").

### 3. Capitol Broadcasting Company

In the SHVERA Report, the Copyright Office was asked to provide an authoritative ruling on whether a proposal of the Capitol Broadcasting Company ("CBC") could qualify as a cable system. CBC offered a meticulous explanation of its business model. It suggested that it would comply with the FCC regulations under the Communications Act, and detailed the extensive, three-tiered security measures it would undertake to ensure that "its technology will confine Internet retransmissions of television station signals within each station's local television market." SHVERA Report at 190-191.

The Office was not persuaded. It noted that while CBC offered a "novel and interesting approach for distributing broadcast content over the Internet," the Office is "reluctant to explicitly state that its planned system clearly fits the definition of cable system under Section 111 of the Act because its architecture is very different from that of incumbent cable systems." SHVERA Report at 193. The Office elaborated that while CBC was working to ensure "massive signal security," it could not "immunize the system from the potential pitfalls of a

distribution model that essentially relies on the Internet." <u>Id.</u>
Given that its system relied on the Internet, it need only be
"cracked" before "content leakage will ensue and massive
unauthorized redistribution will occur."[26] <u>Id.</u>

The fact that the Copyright Office was unwilling to find
that CBC qualified as a cable system is further confirmation
that, despite defendants' contentions, the Copyright Office's
report could not possibly be read as endorsing ivi's technology.
Unlike CBC, ivi has no intention of limiting viewers to their
local stations or complying with the rules and regulations of
the FCC.

Bottom line: there can be no doubt regarding how the
Copyright Office would answer the question before this Court.

### 4. <u>Internet Protocol Distribution</u>

As noted above, the Copyright Office did endorse the notion
that the distribution services which utilize Internet protocol
could qualify as a cable system. Specifically, the Copyright

---

[26] <u>Amici</u> argue that the only service considered by the Copyright Office in the
SHVERA report which is similar to ivi's is CBC. They then take issue with the
Office's "*only*" reason for not extending the license to CBC: the issue of
security. We need not decide whether the Copyright Office's rationale in
rejecting CBC's service is underwhelming. The significant fact for our
purposes is that <u>amici</u> are simply incorrect in their assertion that ivi
provides a similar service to CBC. Unlike CBC, ivi has no intention of
complying with FCC regulations. Further, ivi does not even attempt to limit
its service to localized geographic areas. Thus, even if one were to object
to the Office's conclusion in regards to CBC, in no way does it follow that
ivi's activity is permissible.

Office evaluated AT&T's U-Verse TV and Verizon's FiOS.[27]    In
their memorandum of law, defendants focus exclusively on this
section of the SHVERA Report. There is no debate, however, that
ivi's service fits under the rubric of Internet retransmissions[28]
which the Report unabashedly rejects, rather than Internet
Protocol, which it mildly[29] endorses.

---

[27] While the Copyright Office noted the existence of services from both AT&T
and Verizon, it largely focused its attention on AT&T's U-Verse service since
AT&T was an active participant in the comment process. Thus, most of the
discussion in this section deals specifically with AT&T.

[28] Unlike ivi, AT&T does not use the Internet to deliver its programming and
does not provide a nationwide service. At oral argument, plaintiffs set out
in detail the distinction between "Internet Protocol" services, such as AT&T,
and Internet retransmission services, such as ivi. While we will not
reiterate the technical details, it suffices to say that these distinctions
are real and meaningful. See Transcript at 23-27. Significantly for our
purposes, since AT&T does not use the Internet and owns and controls the
wires that run into its customers' houses, the concern of piracy is absent.
While there is no requirement in Section 111 that a company *own* the wires in
order to be a cable system, surely whether a company has any control over the
wires, and thus can prevent piracy, is relevant.

    More significantly, AT&T offers its cable service to individual
communities and only retransmits the signals intended for those communities.
It does not capture signals from local stations and retransmit them
nationwide.

    Finally, while AT&T has maintained it is not governed by the
Communications Act, as far as this Court is aware it has been complying with
the rules and regulations applicable to cable systems under that statute in
any event. Most notably, it obtains retransmission consent. Pls.' Reply at 6-
7.

[29] The Office was explicit that although it has accepted licensing fees from
AT&T and Verizon, this should "not be interpreted as ratification of the
implicit claims to eligibility." SHVERA Report at 199. It then concluded that
after "consideration of the statutory language and the facts at hand, the
Office finds that there is *nothing in the Act which would clearly foreclose
the application* of the Section 111 statutory license for the retransmission
of distant broadcast signals by either company." Id. (emphasis added).

d. <u>Two Significant Prongs to the Copyright Office's
Analysis</u>

We will now address two issues central to the Copyright Office's interpretations of Section 111 which we find particularly compelling. First, the fact that ivi retransmits plaintiffs' services nationwide, rather than to defined, local areas as is the case for traditional cable systems. Second, ivi's refusal to comply with the rules and regulations of the FCC.

i. <u>Local versus National Retransmissions</u>

We wholly agree with the analysis of the Copyright Office that the compulsory license cannot be utilized by a service which retransmits broadcast signals nationwide.[30]

Beyond the Office's analysis of the legislative history, a common sense approach to the statute and an awareness of its practical implications compels such a finding. In devising the statutory license Congress was fashioning a solution to the limited problem of access to broadcast programming in a way that would nevertheless compensate copyright owners for the use of their works. Given that context, it is obvious that statutory licenses are not intended to permit a company like ivi to take broadcast signals from four major cities located in three

---

[30] We will not repeat the Copyright Office's views on this subject in detail. It suffices to note that the issue of localized retransmissions was central to the Office's view of the inapplicability of Section 111 to both satellite carriers and potential Internet distributors.

40

different time zones and make them available to everyone in the United States, regardless of their geographic location. When Congress enacted Section 111 it wanted everyone to have access to the network television provided by their local broadcast stations. It had no interest in ensuring that all Americans would have several opportunities to watch *The Good Wife* on their computer or Internet-capable device in case they were unavailable at the time it aired in their time zone, or could watch every Seattle Seahawks game no matter whether it is available in their region.

At oral argument, defense counsel noted that his "trouble with the local-only aspect is the very purpose of the statutory license in the first place was to extend signals to places beyond the reach of the antennas from which the signals were picked up. All of it was distant...all of it was going outside of the local community." Transcript at 19. It is true that the statute was aimed at bringing signals to areas they otherwise could not reach. In that narrow sense, the signals were being brought out of their "local" areas. However, it is logically flawed to conclude that the compulsory license allows companies to capture the signals directed at one area and bring them all over the country, to distant areas and time zones. As the Copyright Office has noted, "at the time Congress created the cable compulsory license, the FCC regulated the cable industry

41

as a highly localized medium of limited availability, suggesting that Congress, cognizant of FCC's regulations and the market realities, fashioned a compulsory license with a local rather than a national scope." 62 Fed. Reg. 18705, 18707 (Apr. 17, 1997).

      e. <u>FCC Rules and Regulations</u>

The rules and regulations of the FCC were integral to Congress' statutory scheme. We should note here that we do not hold that ivi is governed by the Communications Act and therefore in violation of plaintiffs' copyrights because its retransmissions are impermissible under the rules and regulations of the FCC. Such a finding would appear to be at odds with the views of both the Copyright Office,[31] and the FCC.[32]

---

[31] The SHVERA Report noted that Internet retransmissions are "free from any of the limitations imposed on cable operators and satellite carriers by the Communications Act and the FCC's rules," thus implying that ivi is not governed by the Communications Act. SHVERA Report at 188.

[32] In a June 2010 adjudication, the FCC denied preliminary relief in a dispute involving a "subscription-based service of approximately eighty channels of video and audio programming using Internet Protocol Television ("IPTV") technology." <u>Sky Angel U.S., LLC</u>, 25 FCC Rcd 3879 (2010). The FCC ruled that Sky Angel did not meet its burden of proof of likelihood of success on the merits because it did not demonstrate that it was subject to the Communications Act. Sky Angel did not appear to be a multichannel video programming distributor, and thus subject to the FCC's authority, since it did not provide a "transmission path" to its subscribers; rather, it was the subscriber's Internet service provider that supplied the path. <u>Id.</u> at 3883.

    Sky Angel's service differs from ivi's in key respects, such as the fact that Sky Angel subscribers received programming through a set-top box that had video outputs to connect to a television set. <u>Id.</u> at 3879. If anything, these differences would appear to make Sky Angel even more like a traditional cable system than ivi. Indeed plaintiffs, who take no position on defendants' interpretation of <u>Sky Angel</u>, argue that it is further support

However, as the Copyright Office has made clear, the fact remains that Congress legislated with an understanding that the cable systems it was granting a compulsory license to would also be subject to the regulations of the FCC. While the Copyright Office appears does not view the definition of "cable system" in the Communications Act and the Copyright Act to be coterminous,[33] no company or technology which refuses to abide by the rules of the FCC has ever been deemed a cable system for purposes of the Copyright Act. Significantly, companies such as AT&T U-Verse, which claim to operate outside of the jurisdiction of the Communications Act, still comply with these rules, most significantly by obtaining retransmission consent.

### f. Legislative Response

While we recognize the ambiguity of Congressional inaction, nonetheless we find it significant that Congress has not taken any action over the decade since the Copyright Office first rejected the applicability of Section 111 to Internet retransmissions. This is despite the fact that Congress has actively legislated in response to the viewpoints of the

---

that ivi cannot be a cable system since it does not provide a transmission path and thus does not use a "facility" which both receives and makes the secondary transmissions. Pls.' Reply at 8.

[33] The Copyright Office's tentative endorsement of the AT&T U-Verse system, which does not appear to be subject to the Communications Act, implies that the Office does not believe that in order to qualify as a cable system under Section 111, an entity *must* be governed by the FCC.

Copyright Office in the past and has revised other aspects of Section 111 during this time. In fact, as far as this Court is aware, not a single member of Congress has even introduced legislation which would alter Section 111 in such a way that would positively impact ivi. In light of this history, it certainly appears that Congress has acquiesced to the prevailing administrative view, particularly given the consistency and resoluteness with which it has been established.

### 3.    Defendant's Textual Arguments

In the face of this record, defendants are forced to argue that the definition of cable system is "remarkably simple and broad." Transcript at 18. In making this assertion, they rely exclusively on the first sentence of the definition of cable system in Section 111(f)(3), namely that a cable system must be a "facility, located in any state...that in whole or in part receives signals transmitted or programs broadcast...and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications for channels to subscribing members of the public who pay for such service."

Defendants' view of the text is unpersuasive. For one, they omit the second sentence of the definition in Section 111(f)(3), which refers to concepts such as "headends" and "contiguous communities" which as the Copyright Office has noted bear no relationship to technologies such as ivi.

In any event, it is far from clear that ivi fits "neatly"
within the first sentence of the definition. For example, as
plaintiffs' point out, it is not obvious that ivi is a
"facility" which *both* "receives" signals and "makes" secondary
transmissions. If one were to subscribe to the view of the FCC
in <u>Sky Angel</u>, it could well be that the viewer's Internet
service provider is making the secondary transmission, not ivi.
Furthermore, as the Copyright Office expressed it is relevant
that ivi does not own any transmission facilities, but rather
hosts and distributes "video programming through software,
servers, and computers connected to the Internet." 72 Fed. Reg.
19039, 19053 (Apr. 16, 2007).

As plaintiffs argue, defendants' view of Section 111
essentially means that anyone with a computer, Internet
connection, and TV antenna can become a "cable system" for
purposes of Section 111. It cannot be seriously argued that this
is what Congress intended.

4.   <u>Summary of Plaintiffs' Likelihood of Success</u>

When weighed against a lengthy and unequivocal
administrative record, a reading of the statute consistent with
Congress' purpose as well as the practical implications of this
decision, and the fact that Congress has remained silent in the
face of consistent and ardent Copyright Office declarations,
defendants' limited reading of the text does not persuade us

that ivi is a cable system under Section 111. ivi streams signals to a nationwide audience, without copyright owners' consent or compliance with the rules and regulations of the FCC. Allowing ivi to continue its retransmissions would stretch the compulsory license far beyond the boundaries that the enacting or any later Congress could have ever imagined, and would "do violence to [the] fundamental premise of the 1976 revision" which sought to ensure that copyright owners would be compensated for the use of their works. See Infinity Broadcasting, 63 F. Supp. 2d at 426.

Thus, plaintiffs have easily met their burden of likelihood of success on the merits.

## C.   Irreparable Harm in the Absence of an Injunction

Our next obligation is to determine whether the plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. Pursuant to the Supreme Court's decision in eBay and its application by the Second Circuit in Salinger, we may not simply presume irreparable harm. Salinger, 607 F.3d at 82 (citing eBay, 547 U.S. at 393). Plaintiffs must demonstrate that, on the facts of their specific case, the absence of a preliminary injunction would actually cause irreparable harm. Id. Thus, a court must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying

46

particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Id. at 81 (internal quotation and citation omitted).

According to the Second Circuit, harm might be "irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." Id. In copyright cases, harm can often be irreparable either in light of possible market confusion, because it is "notoriously difficult" to prove the loss of sales due to infringement, and because of loss of the First Amendment "right not to speak." Id. (internal quotations and citations omitted).

Plaintiffs' various declarations identify numerous harms, which they narrow down into six specific claims in their memorandum of law: (1) destruction in value of licensed programming as a result of greater access to the programming should ivi's service continue; (2) disruption of advertising models and loss of revenue since viewers will now be able to watch television programs when they are shown in Seattle, New York, Chicago, or Los Angeles, and thus potentially at times other than when they are available from local broadcasters with local advertising; (3) interference with distribution agreements that content owners enter into with broadcasters that limit the times, geographical areas, and mode of permitted distribution;

(4) interference with plaintiffs' licensing of their own and other websites to perform their content; (5) disruption of plaintiff's use of foreign markets to grow profits; (6) loss of control over content and exposure to viral infringement as a result of ivi's distribution of their programming via the Internet without any means for plaintiffs to ensure adequate security measures.

Plaintiffs' alleged harms thus fall into two broad categories: one, there is the financial harm, which arises out of the fact that ivi's streaming of their television programming will undermine the value of that content and the ability of plaintiffs to reap the profits from their investment; and two, there is the harm associated with the loss of control over their programming and the possibility of viral infringement.

1. Destruction in Value of Programming and Loss of Profits

Plaintiffs claim that ivi's existence threatens their ability to profit from their works by diminishing their value through greater access and interfering with advertising models. This harm is analogous to the claim often found in cases alleging that violations of the reproduction right by an infringing work will cause a loss of sales. If ivi continues its infringement, viewers will be able to obtain plaintiffs' programming from unsanctioned sources, and thus the ability of plaintiffs to profit from sanctioned sources would inevitably

drop. Additionally, because viewers will be able to watch
stations outside of their geographic area, the amount that local
advertisers would be willing to pay to advertise during
plaintiffs' broadcasts would fall. These losses are "notoriously
difficult" to prove and nearly impossible to quantify, and
accordingly are considered irreparable. See, e.g. Salinger, 607
F.3d at 82 (loss of sales due to infringement is "notoriously
difficult" to prove); Pearson Educ., Inc. v. Vergara, 09 Civ.
6832 (JGK)(KNF), 2010 U.S. Dist. LEXIS 101597 (Sept. 27, 2010)
(post-Salinger case holding that decline in sales of textbook as
a result of greater access to infringing works is an injury
difficult to quantify and which plaintiffs should not be
expected to suffer).

Defendants' various responses to plaintiffs' allegations of
financial harm are unavailing. In answer to the claim that ivi's
service will diminish the amount that plaintiffs will be able to
charge licensed cable operators for their programming,
defendants aver that plaintiffs are merely complaining that ivi
provides increased competition, which could ultimately lead to
lower prices. They argue that this is not a legitimate harm
because any time a company exercises its right to a statutory
license, this issue arises. According to defendants:

> "Every time any company exercises its rights to a
> statutory license under Section 111, the Media
> Companies may have a diminished ability to sell that

same content to yet another entity outside the
structure of the statutory license. The pricing for
use by ivi and other statutory licensees, however, is
statutorily fixed. Even if the value of the content is
theoretically diminished, that possibility is
recognized, protected by the statutory fee structure,
and is in the public interest. Any diminution in value
of the content is also recovered by the Media
Companies because ivi literally pays for its use of
the content in the form of the statutory license."

Defs.' Opp'n at 19

This argument proceeds on the fallacy that ivi qualifies as
a cable system. Obviously, if ivi were a cable system,
plaintiffs could not complain about lost licensing opportunities
and diminution of value as a result of ivi's statutory license.
As ivi has no license to broadcast plaintiffs' programming,
however, defendants obviously cannot rely on the existence of a
preexisting pricing mechanism which does not apply to them in
order to rebut plaintiffs' allegations of harm.

Defendants assert a similar and equally meritless argument
in order to challenge the claim that ivi's activities unfairly
compete with websites that are owned or licensed by plaintiffs
and which carry plaintiffs' programming. They state that if ivi
unfairly competes with licensed websites, then "every cable
system, satellite system, recording device, SlingBox, and on-
demand service would also interfere with such websites." Defs.'
Opp'n at 21. They continue that "this same content is already
available in so many ways and in so many places, including the

Internet, that ivi's service cannot possibly interfere with any of it." Defs.' Opp'n at 21.

We will not accept any argument premised on the fact that preexisting technologies operating within the law may potentially devalue plaintiffs' copyrights as a basis to justify defendants' conduct which is unsanctioned and contrary to law.

Defendants also take issue with the general notion that ivi could "destroy" the value of plaintiffs' content. They argue that ivi is far too small, and that since plaintiffs' programming is already given away over the air and through the internet and retransmitted by thousands of cable systems, "adding ivi to the mix can scarcely 'destroy' the value of the programming content." They even contend that the plaintiffs' use of the word "destroy" underscores that plaintiffs' alleged harms are hyperbolic and "utterly abstract." Defs.' Opp'n at 19.

This is a recasting of the same faulty arguments rejected above. Defendants cannot seriously argue that the existence of thousands of companies who *legitimately* use plaintiffs' programming and pay full freight means that ivi's *illegal* and uncompensated use does not irreparably harm plaintiffs. Likewise, they cannot contend that since ivi is small and plaintiffs are large, they should be allowed to continue to steal plaintiffs' programming for personal gain until a

resolution of this case on the merits. Such a result leads to an unacceptable slippery slope.

Lastly,[34] defendants take issue with plaintiffs' argument that they will lose advertising revenues as a result of ivi's service. Defendants' assert that the "crux of this argument is that measurement agencies do not currently measure ivi's viewers, and therefore the number of viewers of a program will be undercounted," a proposition that defendants dispute. Defs.' Opp'n at 20. Beyond that, they make the same unpersuasive arguments: first, the number of viewers on ivi is too small to present an undercounting problem; second, plaintiffs contribute to this problem through their own websites, such as mlb.com, which offers their programming on the Internet; and third, other technologies, including SlingBox, TiVo, and VCRs, also lead to the same potential issues. Although it bears no repeating, we reiterate our refusal to credit any argument which relies on the fact that ivi is too small to cause irreparable harm or that other companies provide similar services. The fact that there are countless ways for viewers to avoid advertisements does not make defendants' illegal use acceptable.

---

[34] We will not address plaintiffs' allegation that ivi interferes with foreign markets. While this would certainly be a significant harm, the present record does not demonstrate that plaintiffs' programming is available outside of the United States.

In any event, plaintiffs' primary concern regarding advertising revenue is that users of ivi's service will be able to watch programming not intended for their market, thus viewing advertisements directed to a different market. By diverting customers who would otherwise watch their local stations, defendants are weakening plaintiffs' negotiating position with advertisers, even if ivi's viewers were adequately counted by measurement agencies.

2. <u>Loss of Control Over Content and Viral Infringement</u>

Plaintiffs' complain that defendants put them in a precarious position and divest them of control over their content by streaming it on the Internet without allowing plaintiffs any control over copy protection measures. Furthermore, there is a concern that since plaintiffs have no control over ivi's distribution, they cannot prevent their works from being retransmitted abroad, which may violate international treaties.

While these are potentially serious harms, this is not the appropriate time to address these complex and technical issues. Suffice it to say that plaintiffs have amply shown irreparable harm in other ways, and that is sufficient.

3. <u>Actual versus Speculative Harm</u>

Above all else, defendants rely on their belief that all of plaintiffs' alleged harms are speculative and hypothetical. This

contention is made in their memorandum, and at oral argument counsel triumphantly insisted that in the four months since briefing, there have been "no harms" and that there was no "submission of any [of] the speculative alleged harms coming true." Transcript at 3. Counsel argued that instead of the "imminent, substantial, and real" harms required by case law, "before the Court are a listing of things that are all hypothetical and speculative. As far as we are aware, none of those has occurred or genuinely is likely to occur." Transcript at 21-22.

It appears obvious to us that defendants have unwittingly demonstrated why the harm they present to plaintiffs is irreparable. There can be no dispute that by taking away viewers from sanctioned entities which compensate or otherwise obtain permission from plaintiffs for the use of their works, defendants are intruding on plaintiffs' copyrights and taking away business opportunities. This being the case, one might wonder why it is that plaintiffs have not "submitted" specifically identifiable, enumerated, and quantified harms, as defendants seem to believe is necessary. The logical conclusion is that plaintiffs have not made such "submissions" because they cannot specifically demonstrate or quantify the harm that ivi has caused. There is no way to know how many people have used ivi rather than sanctioned methods to watch plaintiffs'

programming, or how many people have used ivi to watch programming that should not have been available in their geographic area. Furthermore, even if we could determine these numbers, we would still not be able to ascertain the precise financial impact on the plaintiffs.

Defendants contend that because plaintiffs cannot specify the harm, it must be speculative. In contrast, we find that it is because the harms are unquantifiable, and thus irreparable.

D.   Balance of Hardships

The next consideration is a balance of hardships between plaintiffs and defendants. Plaintiffs, as addressed above, have adequately identified the hardships they will face without an injunction. ivi, on the other hand, argues that an injunction would be "catastrophic" and would "effectively put ivi out of business, most likely permanently." Defs.' Opp'n at 5.

While it is a practical hardship for ivi to go out of business, it is not a legally recognized harm. It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product. Warner Bros. Entm't Inc. v. RDR Books, 575 F.Supp.2d 513, 553 (S.D.N.Y. 2008) (citing My-T Fine Corp. v. Samuels, 69 F.2d 76, 78 (2d Cir. 1934) (Hand, J.); Concrete Mach. Co. v. Classic Lawn Ornaments, 843 F.2d 600, 612 (1st Cir. 1988); Apple Computer Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983).

Having found that ivi has infringed plaintiffs' copyrights, it follows that ivi is not legally harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts ivi out of business.

We note that defendants are placed in the uncomfortable position of having to argue that they will suffer immense hardship as a result of an injunction because their use of plaintiffs' programming is popular, and that without the plaintiffs' programming there will not be enough demand for ivi's service. Essentially, defendants argue that the difference between profitability and bankruptcy is the ability to retransmit plaintiffs' programming. This argument underscores the threat ivi poses to the plaintiffs. ivi's popularity means that viewers who would otherwise access plaintiffs' works through legal means can now access them through ivi. Such unsanctioned use is precisely the harm that the copyright laws seek to avoid, subject to the limited situations where a work can claim to be a fair use, seek refuge in a compulsory license, or find some other limited defense to the copyright laws.

E.   The Public Interest

Lastly, we must consider the public interest. In so doing, we note that the object of copyright law is to "promote the store of knowledge available to the public." Salinger, 607 F.3d at 82. To the extent that the copyright law "accomplishes this

end by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest may well be already accounted for by the plaintiff's interest." Id.

In this case, the relevant "store of knowledge" is network television programming, and the public interest is clearly protected by issuing an injunction. If plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming. In contrast, ivi simply provides an additional way, among many others, for consumers to view the copyrighted programming created by plaintiffs. Significantly, however, plaintiffs currently retain control over how and where this material gets distributed, including Internet retransmissions, through negotiated licenses and other mechanisms.

Defendants and amici argue that an injunction in this case would be anti-competitive, and thus against the public interest. In the copyright context this is not a significant concern. Copyright law by definition allows for monopolies and anti-competitive behavior. The premise of the copyright laws is to award the owner a set of exclusive rights in order to incentivize future authors and creators. This is why the framers granted Congress the power to enact copyright laws, and why every Congress since 1790 has seen fit to do so.

Furthermore, the Copyright Office has spoken clearly that it would be inappropriate for Congress to expand existing law and provide compulsory licenses for services such as ivi. This is the federal agency charged with enforcing the copyright laws and tasked with acting in the public interest. We have no reason to doubt its considered judgment, and we decline to do so.

## CONCLUSION

For the aforementioned reasons, plaintiffs have demonstrated the need for a preliminary injunction. As it is extraordinarily unlikely that ivi will ultimately be deemed a cable system under Section 111, plaintiffs have demonstrated a likelihood of success on the merits of their copyright claim. They also have demonstrated irreparable harm, that the balance of hardships tip in their favor, and that the public interest will not be disserved by an injunction.

Thus, plaintiffs' motion for a preliminary injunction is granted and it is hereby

**ORDERED** that defendants and their officers, agents, servants, employees, and attorneys who receive actual notice of this injunction by personal service or otherwise, and all other persons who are in active concert or participation with any of them who receive actual notice of this injunction by personal service or otherwise, are hereby **ENJOINED** from infringing by any means, directly or indirectly, any of plaintiffs' exclusive

rights under Section 106(1)-(5) of the Copyright Act, including but not limited to through the streaming over mobile telephone systems and/or the Internet of any of the broadcast television programming in which any plaintiff owns a copyright.

**SO ORDERED.**

Dated:      New York, New York
            February 22, 2011

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

        Copies of the foregoing Order have been mailed on this date to the following:

**Attorney for Plaintiffs**
Peter L. Zimroth
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022

**Attorneys for Defendants**
Lawrence D. Graham
Black, Lowe & Graham PLLC
701 Fifth Avenue
Suite 4800
Seattle, WA 98104

Gavin Ira Handwerker
Nissenbaum Law Group, LLC
2400 Morris Avenue
Union, NJ 07083